1       IN THE UNITED STATES DISTRICT COURT
             FOR THE DISTRICT OF COLORADO
2

3    Criminal Action No. 24-cr-0003-GPG

4    UNITED STATES OF AMERICA,

5        Plaintiff,

6    vs.

7    LYNDRETH HEMP WALL,

8        Defendant.
     _____

9                    **REPORTER'S TRANSCRIPT**
             VIDEO TRIAL PREPARATION CONFERENCE
10   _____

11          Proceedings before the HONORABLE GORDON P. GALLAGHER,

12   Judge, United States District Court for the District of

13   Colorado, occurring at 11 a.m., on the 6th day of May, 2025, in

14   Courtroom 323/Grand Junction, United States Courthouse, Denver,

15   Colorado.

16                          **APPEARANCES**

17          Jeffrey K. Graves and Riley Josh Player, U.S.

18   Attorney's Office, 835 East 2nd Avenue, Suite 410, Durango, CO

19   81301, appearing for the Government.

20          Laura Hayes Suelau, Amy W. Senia, and Summer Woods,

21   Office of the Federal Public Defender, 633 Seventeenth Street,

22   Suite 1000, Denver, CO 80202, appearing for the Defendant.

23

24              TAMMY HOFFSCHILDT, Official Reporter
               901 19th Street, Denver, Colorado 80294
25          Proceedings Reported by Mechanical Stenography
              Transcription Produced via Computer

1

2                        **P R O C E E D I N G S**

3        (In open court at 11:03 a.m.)

4            THE COURT:  All right.  Good morning everybody.  We're

5    here in Mr. Wall's case.  This is 24-cr-3.  Mr. Wall is excused

6    for -- oh, he is not.  Mr. Wall is here, so excuse me.

7            Good morning, Mr. Wall.  Can you hear and see us?

8            THE DEFENDANT:  Yes, sir.

9            THE COURT:  All right.  Mr. Wall is here.  For the

10   government we have Mr. Graves and Mr. Player.  Can you both

11   hear us?

12           MR. PLAYER:  Yes.

13           THE COURT:  Okay.  All right.  The record reflect that

14   they both indicated they could hear us, and for the defense we

15   have Ms. Senia, Ms. Woods, Ms. Suelau.  And can you all hear

16   us?

17           MS. SUELAU:  Yes, Your Honor.

18           THE COURT:  Nodding, and Ms. Woods indicated yes.

19   Okay.  The matter is on today for a further motions hearing

20   slash pretrial conference.

21           Let me start, Mr. Player, with what do you think that

22   we need to be addressing today, just kind of in general, so we

23   make sure that we get it to the list.

24           MR. PLAYER:  Your Honor, I believe we're going to be

25   addressing what forms the jury instructions might take, in

1    regard to this case, including the ones proposed by the Court,

2    as well as setting a final date for the witness list, and

3    exhibit lists, and any other deadlines that are appropriate, as

4    determined by the Court or requested by defense counsel, and

5    that is all I am anticipating the Court hearing argument on

6    today.

7         THE COURT:  All right.  Let me turn to the defense,

8    and then I will go through my list after that, to the extent

9    that it agrees or disagrees with those or I think there's more.

10   Go ahead.

11        MS. SUELAU:  Your Honor, I think we need to reach at

12   least most of the preliminary and final instruction questions,

13   set a deadline for the witness and exhibit lists, and to the

14   extent -- I know we talked about some logistical things with

15   the courtroom last week, but to the extent that there's

16   anything additional on that.

17        THE COURT:  All right.  So, I guess my first issue

18   that controls some of these other matters -- well, let me back

19   up and say, I have, on my list, discussion of the preliminary

20   jury instructions, potentially some discussion of the jury

21   instructions, particularly as it goes to, kind of, the heart of

22   the matter, which is the elements and some other instructions

23   specifically related to the charges in this matter, not as much

24   with regard to other non-charge-related jury instructions.  I

25   think those are no less important, but don't bear as much on

1    what's going to happen during the course of trial, so don't

2    necessarily need to take up space today.

3         Anything further they we need to discuss with regard

4    to Rule 413, and then there was some lingering voir dire

5    discussion to occur, as it tied into the jury instructions,

6    particularly to the idea of mental incapacity.  So, those are

7    on my list.  But the first thing I want to discuss is in terms

8    of our trial date.  I know there had been at least some

9    discussion about whether or not the trial dates, as currently

10   set, are viable.

11        From the defense perspective, where are you sitting on

12   that right now?

13        *MS. SUELAU:*  Your Honor, from our perspective, we

14   intend, at this point, to move forward on the 19th.  I think

15   that there's a few things that might change or inform that

16   decision, that includes some outstanding subpoena duces tecum,

17   I guess, clarifications we are seeking to get, based on a prior

18   subpoena, and subpoenas we anticipate filing today.  Also

19   depends, in some part, on Your Honor's ruling in regards to the

20   413 evidence.  So, that may change whether or not we can

21   proceed on the 19th.

22        *THE COURT:*  Okay.  And when do you realistically --

23   from the perspective of the back-of-the-house things that we

24   need to know, obviously, more time the better, when do you

25   think your kind of final drop-dead date is for knowing those

1   things?

2        *MS. SUELAU:*  I think it's contingent on Your Honor's

3   ruling on 413, in large part.  So, that would inform our

4   drop-dead date.  I think we should have -- you know, my hope

5   would be that we would know on Friday, our decision, you know,

6   and that a drop-dead date I would think would be Monday,

7   understanding, of course, you know, things happen in trial

8   preparation that are unanticipated, but it's -- I understand

9   that for Mr. Wall and all parties it would -- and witnesses and

10  victims, everyone involved, the sooner the better.

11       *THE COURT:*  Sure.  Well, and let me talk about the 413

12  for a moment.  I do intend here, in a moment, to open it up to

13  further argument, offers or the like, but I don't want to be in

14  the position of giving an advisory or preliminary order on the

15  matter.  So, this is not a further order, but I think it's fair

16  to say there's a substantial amount of briefing and related

17  documents and evidence that has been presented already to the

18  Court in the context of the 413 issues.  We have spent a

19  significant amount of time working on a draft order in advance

20  of today, understanding that we need to plug in whatever comes

21  up today, but to the extent that it affects the defense's

22  determination with regard to a trial, and I think you will have

23  that order within the next of couple days, but I don't want to

24  make any promises on that, because I don't know what's going to

25  happen today.

1          I think it's fair to say that a good portion of the

2     413 evidence is likely to be determined admissible by me.  So,

3     to the extent that informs the defense further, in terms of

4     where they're going to go, or somebody thinks that's not going

5     to leave us with not enough trial days or other issues related

6     to that.  I'm not going to say all of the 413 evidence is

7     coming in.  It all deserves and will receive individualized

8     attention from me, as to each of the 413 incidents that the

9     government wants to try to admit, but after reviewing it in

10    depth, significant portion of it, at the very least, is coming

11    in.  So, to the extent that that makes a difference to you, now

12    you know that.

13         I think that probably is the appropriate place to

14    start then.  So, let me turn, Mr. Player, or, Mr. Graves, to

15    you all, then with regard to the 413 in terms of evidence.

16    It's, in large part, the defense's motion to keep it out, but I

17    want to start with evidentiary matters.

18         Do you intend to offer any additional 413 evidence at

19    this point, by way of offer of proof or exhibits or -- I don't

20    think we're set up for any testimony today, but I don't want to

21    presume that -- testimony in any other fashion; do you want to

22    add my any further 413 evidence.

23         *MR. GRAVES:*  Your Honor, I will speak for the

24    government on its behalf.  We appreciate the opportunity to do

25    so, however, we're not planning on submitting to the Court, for

1    its preliminary 413 decision, any additional evidence besides

2    what has already been provided, the exhibits, the recordings

3    and the proffer and the government's briefing, and I would, of

4    course, be happy to answer any specific questions that the

5    Court has, but we don't have any additional evidence to offer,

6    at this juncture.

7         *THE COURT:*  Okay.  Then let me turn to the defense.

8    As indicated, I have carefully reviewed all of the briefing,

9    but from the defense what further argument or presentation in

10   opposition to the 413 evidence would you like to make?

11        *MS. SENIA:*  I don't know that we had anything

12   specifically planned, Your Honor.  If you had questions, I'm

13   happy to answer them.  I think, you know, if there's additional

14   things that you would like -- Your Honor would like me to say

15   about it.  I think, you know, the Rule 403 exists for a case

16   exactly like this one, where there might be evidence that is

17   probative and relevant, but we have to look at what the dangers

18   are, as well, in admitting such evidence, and I am not aware of

19   any case where there was significantly more inflammatory

20   allegations under 413 that came in, compared to the allegations

21   that were charged, and that's -- you know, the principle

22   underlying that is really about unfair prejudice, that if you

23   have much milder or less serious allegations that the jury has

24   to actually decide, then if you are letting in very different

25   allegations that are substantially more serious, that just

1   creates a huge risk of unfair prejudice, and essentially,

2   ensures that, you know, Mr. Wall wouldn't get a fair shake

3   here, because we can't expect any reasonable jury to be able to

4   ignore allegations of extreme violence, when they are tasked

5   with deciding allegations that are more about fraud or

6   trickery.

7          And then I also think that, you know, there's no other

8   case like this, in terms of how confusing it will be.  Every

9   single Tenth Circuit case has one alleged victim, and so that's

10  why they need additional 413 victims to come in to corroborate

11  that testimony, and while there might still be additional

12  corroboration in a case where there's more alleged victims, the

13  problem is that it gets more and more confusing, and more and

14  more cumulative with every witness, and so a jury is going to

15  have a real hard time keeping straight who everyone is and what

16  the incidents were and what the factual circumstances were.

17         So -- and then, of course, there's the risk that the

18  government isn't going to be able to meet the standard at

19  trial, and then every witness or every alleged 413 incident,

20  the defense will have to object, move for a mistrial, move to

21  strike testimony, that's also going to take a lot of time, and

22  I think with both the witnesses, that the government is going

23  to call, as well as additional conduct, with the witnesses that

24  are already going to be called, plus all of the defense

25  rebuttal case, I think that's looking at at least three, if not

1    more, days of additional testimony.  That's a long time to keep

2    a group of people around, for charges that they aren't actually

3    going to be deciding, in terms of, you know, beyond a

4    reasonable doubt, whether the allegations have been proven

5    here, in the government's Superseding Indictment.

6         So I think -- I'm happy to answer any other questions

7    that Your Honor has, but I think this -- it's going to be time

8    consuming, it's going to be extremely confusing.  I don't think

9    we can expect any reasonable jury to keep everyone straight.

10   It's going to be legally confusing.  And it's going to be --

11   add allegations that are substantially more inflammatory,

12   creating a very serious risk of unfair prejudice.

13        *THE COURT:*  All right.  One question, specifically as

14   it goes to procedural matters, it seems likely to me that

15   following the conclusion of any witness who presents 413

16   testimony or potentially any discrete 413 acts, if a witness

17   relays more than one 413 act, the defense is likely to argue

18   that the burden hasn't been met, that the evidence should not

19   be admissible, and perhaps that the jury having already heard

20   that evidence and being unable in their mind or minds to unring

21   that bell, that there should be a mistrial.  And, of course,

22   I'm not foreclosing that in some circumstances a mistrial is

23   appropriate.  In some it is, in some it isn't.  But from a

24   practical perspective, it would seem to me like, potentially,

25   we could group those mistrial arguments at the end of any

1 particular testimony day, and agree on the record that the

2 contemporaneous objection has been preserved, or maybe the

3 defense could make that objection just in some more generic

4 way, that there's a 413 objection to be addressed later, and I

5 will note that it's preserved for the record, and then we will

6 address it at the end of the day, with the intent not to have

7 the jury coming in and out of the courtroom.

8 From the perspective of prejudice to anybody, frankly,

9 I fail to see how that would prejudice anybody.  If the defense

10 is right, and a mistrial is granted, we've had, you know, a

11 number of unnecessary trial hours, but there's still a

12 mistrial.  If the defense is wrong, and a mistrial isn't

13 granted, then we have not interrupted the flow of the day or

14 the witness, and are able to proceed along in a more efficient

15 manner.

16 What are your thoughts, Ms. Senia, with regard to some

17 type of procedure along those lines?  Understanding we can

18 flesh out the procedure in a little more detail between now and

19 trial.

20 *MS. SENIA:*  I think the defense would have to object

21 to that.  There's -- there's a number of problems with that,

22 but, I think, you know, for the record, of course a mistrial is

23 the ultimate remedy, but there's curative or remedial measures

24 that can be taken short of a mistrial, that we would have to

25 ask for, to be able to preserve those arguments for appeal.

1    And so I think every -- every -- every 413 act, we would have

2    to make our record and, you know, we -- I think we would take

3    the position that we need to know what the specific crime is

4    that the government is alleging happened, so that we can also

5    make our record on that.

6          We would have to be able to have jury instructions

7    that we could argue to the jury, for example, if they are

8    moving forward with mental-capacity theory, that's a different

9    definition, depending on the jurisdiction, and we need to know

10   what it is, so we can make those arguments to the jury that the

11   evidence that the government has presented, also doesn't meet

12   the legal standards.  That would be both an argument

13   contemporaneously to the Court, as well as if Your Honor ends

14   up letting the evidence in and not granting a mistrial or not

15   taking other remedial measures, then that would allow us to

16   argue that to the jury at the end of the case.

17        *THE COURT:*  I think that's a fair point, and probably

18   a good reason -- well, I will address, that included a couple

19   of issues.  One of which is how we need to address the crime

20   that the government is alleging has been committed.  That will

21   be addressed in my order.  Of course, the defense is free to

22   contemporaneously object, that whatever the evidence is doesn't

23   meet that standard.  Once they've heard the evidence in trial,

24   that's a different issue.  But in terms of the idea that the

25   defense contemporaneously asking for remedial measures, that is

1    a fair point, that may need to occur, which would argue against

2    in some way grouping these at the end of the day.  So I will

3    consider in my mind whether or not we're going to group these

4    by witness.  I'm less sold on the idea that that's prejudicial

5    to the defense, but we can talk about that if we get to the

6    point where more than one event per witness is being issued.  I

7    haven't drilled down to it to that extent yet, so I'm not sure

8    that we're there.

9         So, at this point, I won't ask the government for a

10   response on that point, because I'm not going to do it at the

11   end of any particular day.

12        What else, Ms. Senia, do you think we need to discuss

13   before I turn to Mr. Graves?

14        *MS. SENIA:*  I think maybe the only other thing, if you

15   don't have other questions, Your Honor, is just looking at the

16   *Guardia* case, out of the Tenth Circuit.  You know, the Court

17   determined there that it would be too confusing for the jury to

18   have all of these multiple allegations in a case that is both

19   legal and factually the most similar to this one of any of the

20   cases cited by either party, and so I think I would urge the

21   Court to look at that case, as well, because I think there's a

22   real risk of jury confusion here.

23        *THE COURT:*  All right.  Thank you very much.  I will

24   turn to Mr. Graves and, of course, since it's, essentially,

25   your motion or objection, I will turn back to the defense for

1    the final word.

2         Mr. Graves, your position, please.

3         *MR. GRAVES:*  Your Honor I think the issues are really

4    well teed up for the Court, based on our prior hearing, as well

5    as the briefing.  Just to highlight the responses to what the

6    defense said today.

7         First of all, the notion that these are, in any way,

8    very different allegations from the counts that have been

9    charged to the 413 acts, is really belied by the facts; and

10   what do I mean by that?  There is this signature quality that

11   runs through each and every fact.  That is a through line that

12   would meet the demanding 404(b) standard, and certainly should

13   increase, in the Court's mind, the relevance and the

14   probativity of each of the acts.

15        Defense counsel also characterized some of the 413

16   acts as cases involving, quote, extreme violence, unquote, and

17   whatever the Court -- however the Court interprets those acts,

18   I think specifically she is talking about the acts in Denver,

19   they certainly don't involve extreme violence, as that term is

20   understood, at least in sexual assaults.

21        They involve situations where the defendant, using his

22   characteristic and trademark moves, lured a victim into an

23   isolated location, with the promise of healing or ceremony, and

24   then engaged in nonconsensual, nonpermissive sexual acts with

25   those individuals.  There was no, you know, bashing over the

1    head.  There was not holding at the point of a knife.  Now,

2    there are some differences, but those differences are

3    insignificant, from the government's perspective, in comparison

4    to the signature quality of each act that all of them shares.

5         Juries are smart.  Juries are called on in this

6    country to deal with cases involving hundreds of victims,

7    involving hundreds of counts.  They deal with complicated jury

8    instructions all the time.  Obviously, the government believes

9    the jury instructions on the 413 matters can be significantly

10   more streamline than the defense's position.  We believe they

11   are legally incorrect as to that, but this case is no different

12   to many cases where's juries are called upon to remember what

13   evidence is being admitted for a specific purpose.

14        I know that if the Court admits that evidence it will

15   so instruct them both contemporaneously and at the end of the

16   trial, and juries are, of course, presumed to follow

17   instructions.

18        With respect to motions for a mistrial or striking

19   testimony, I just want to take a step back, and I think it's

20   important, at least from the government's perspective, when

21   that would be appropriate.  The Court would have to determine,

22   without weighing the credibility of the witness, that for some

23   reason their testimony is incredible, as a matter of law, in

24   order to grant that motion.  That would be no different than

25   any other witness that was providing important and relevant

1  testimony.

2      If a detective testifies, and for some reason the

3  Court was able to find that the case agent was incredible as a

4  matter of law, it would be in the same situation as if a 413

5  witness testified, and they were incredible as a matter of law.

6  That's a very high standard.

7      The *Guardia* case I would just point out to the Court

8  that that's a very different procedural posture, in how that

9  case arrived before the Tenth Circuit.  The District Court

10  ruled against the government, and the government took an

11  interlocutory appeal, and so the standard of review in that

12  case was abuse of discretion, which I think is important to

13  bear in mind that I strongly suspect that if the District Court

14  had gone the other way, the Tenth Circuit would find no error

15  there either.

16      One thing I do want to flag on this topic, and it

17  plays into the point that the Court raised with respect to the

18  timeline here for trial.  Defense counsel had previously

19  indicated that they were considering offering Rule 12 evidence

20  for some of the 413 actors, and I would just point out that

21  there's a very specific procedure to determine the

22  admissibility of those actions, that needs to be done at least

23  14 days before trial, a time limit which has lapsed, and it

24  also requires an ex parte hearing with notice to the victim and

25  the opportunity to participate.

1    Now, we're not trying to jam the defense up
2  necessarily on Rule 412 evidence if we can accommodate --
3  accomplish this quickly, but I think it is worth noting that we
4  are now 13 days from trial, that issue has not been raised with
5  respect to the 413 witnesses, and if we are going to try to
6  follow that procedure, we would obviously do so extremely
7  expeditiously.  If the Court intended to admit the 413 evidence
8  where that rule was implicated.

9    I don't have any additional argument or points for the
10 Court, unless the Court has specific questions.

11   *THE COURT:*  I do have one question.  So, with regard
12 to my analysis -- sorry, let me get closer to the microphone.
13 With regard to my analysis of the 413 witness testimony, what
14 if I just simply believe that it is insufficient for a
15 reasonable jury to conclude that a crime of sexual assault
16 occurred?  Is that enough?  Or do I have to find, in your mind,
17 incredible as a matter of law?

18   *MR. GRAVES:*  Your Honor, the -- if I can have a
19 moment, I can probably pull up --

20   *THE COURT:*  And then within that, do I have to strike
21 the entire testimony or declare a mistrial, if the testimony
22 isn't sufficient or only a portion of it?  What do you think
23 the correct procedure is on that?

24   *MR. GRAVES:*  Your Honor, in terms of the preliminary
25 standard, and I think this is reflected in many of the cases,

1  looking at Rule 413, it's the *Huddleston* standard, which is a

2  404(b) case, and essentially what the Court needs to decide is,

3  based on the proffered evidence, could a reasonable jury, if

4  they believe the evidence, find that it's more likely than not

5  that it occurred?  So, that is our position as to what the

6  Court's inquiry is, at this point.

7          At trial, the question then becomes could -- after the

8  testimony is admitted, could a reasonable jury who heard the

9  testimony in court, find that the act happened, more likely

10  than not?  And it's our position that, assuming the 413 victim

11  comes in and testifies consistent with what they proffer, that

12  the credibility determination is ultimately up to the jury,

13  unless, like every instance of testimony in court, if the Court

14  concludes that the testimony was incredible as a matter of law,

15  to the point that they -- the Court is taking that out of the

16  hands of the jury, that's a very high standard, but ultimately

17  the credibility determination is up to the jury.

18          THE COURT:  Okay.  Anything else, Mr. Graves, before I

19  turn back to Ms. Senia?

20          MR. GRAVES:  No, Your Honor.

21          THE COURT:  Okay.  Thank you.  Ms. Senia?

22          MS. SENIA:  Just to start with that last point,

23  Your Honor.  So, I think the answer to your question is that

24  there are two different -- two different things that could come

25  up.  It could be a factual issue that it's facially incredible,

1  and that separately, that there is a legal question of whether

2  those facts meet the legal standards.  And so, the government

3  says, Your Honor, the jury only have to decide if an act

4  occurred or an act happened, but if you look at the text of

5  Rule 413 it requires that there's another commission of a

6  sexual assault, and so we're not just doing the regular

7  *Huddleston*, we're making a preliminary fact determination, it's

8  also a factual determination that gets applied to the law.

9          So it's --

10  *THE COURT:*  I guess -- and let me stop on you that

11  point.  Just try to think of an example.  So, I suppose if the

12  witness then testified differently than the offer of proof,

13  because presumably my job is to match the offer of proof up

14  with whatever I think those elements are in advance, to

15  prescreen for that, so we don't end up with that issue, but for

16  example, if a witness testified differently than that, and it

17  wasn't necessarily incredible, as a matter of law, but didn't

18  sufficiently meet the elements of whatever the crime was, then

19  we could be in that position?

20          *MS. SENIA:*  That's exactly right, Your Honor.

21          *THE COURT:*  Okay.  Go ahead.

22          *MS. SENIA:*  So, I think I addressed that point.  On

23  the Rule 412 point, I would just also point out that while

24  there is a 14-day notice requirement, it also allows that

25  notice to be excused for good cause, and of course there's good

1    cause, because we don't know what witnesses yet are going to

2    come in.  So, it's not -- the defense is not intentionally

3    trying to hide the ball.  We are waiting for a ruling from the

4    Court, and then once we have that ruling, we will, of course,

5    make that notice to the government as soon as possible.

6           I think turning to the issue of confusion, the

7    government claims that juries are smart, and this really

8    isn't -- if we accept that as true, this isn't an issue of how

9    smart someone is or how intelligent someone is.  It's really

10   just about logistically, how is the jury going to be able to

11   keep everything straight in their minds, factually and legally

12   when you have so much going on here, and so many different

13   people, so many different events?  And the government's

14   reference to all of these acts having a signature quality, just

15   makes it all the more confusing.

16          You know, which witnesses involved the feather?  And

17   which witnesses involved the crystal?  And that is not just a

18   theoretical issue that might come up.  It's what if we have --

19   the defense has a devastating Cross-examination as to one of

20   the events.  There's just -- you know, maybe it doesn't rise to

21   the level of facially incredible, but it's so devastating that

22   we don't --

23          THE COURT:  Just a moment.  Let's wait.  Let's stop.

24   Thank you.

25          THE COURTROOM DEPUTY:  Just lost Mr. Wall.

1          *THE COURT:*  I saw the pictures change, but I couldn't

2    tell immediately.

3          *THE COURTROOM DEPUTY:*  Mr. Wall, can you hear us?

4          *THE DEFENDANT:*  Yes, Your Honor, I can hear you

5    perfectly fine.

6          *THE COURTROOM DEPUTY:*  Okay.  Your video is out, so we

7    can not see you.

8          *THE DEFENDANT:*  I'm sorry.

9          *THE COURT:*  No problem, we just want to make sure you

10   are still there.  Is there a deputy with you, who might be able

11   to turn that back on?

12         *THE DEFENDANT:*  Yes.  It's -- I see you now.

13         *THE COURT:*  We do not see you, so let's give it a

14   moment, and see if we can't get that so that we can -- by

15   seeing you, we know you are there.  There we go.  Okay.  Thank

16   you very much.

17         Ms. Senia, go ahead.

18         *MS. SENIA:*  So, you know, just to offer an example,

19   there could be two factually really similar allegations.  You

20   know, imagine the defense has a devastating Cross-examination

21   as to one but not to the other.  At the end of the trial, when

22   the jury is going through not only all 20 counts in the

23   Superseding Indictment, but all of the 413 evidence, we can't

24   guarantee that the jury is going to remember, *Oh, that was J.O.*

25   *on the third act.*  *Oh, it it was the second act, that was*

1   *actually K.B.* Those sorts of determinations are going to be

2   impossible for the jury to make.

3      *THE COURT:* Well, is that -- I mean, I guess I push

4   back on that a little bit. Certainly, any time you have more

5   than one alleged victim, be it a sex assault or another case,

6   you always -- I mean, that's always why the defense would love

7   to try one act with one victim independently, because it offers

8   that if the jury doesn't believe this particular act, maybe you

9   have a better chance of acquittal, versus a circumstance with

10   multiple victims, even though juries are told don't -- you

11   know, you have to do an up-and-down vote on each count on each

12   victim. You worry that they won't. I mean, that's

13   understandable, because of human nature. But some of this

14   truly just comes down to organization by me and by the parties,

15   to explain that, and yes it gets more complicated every time

16   more information gets added, but this is not the avalanche of

17   information that sometimes exists in federal cases that go on

18   for months and months. This is not an organizational task that

19   appears to be beyond any of us. So, I understand it makes it

20   more complex, but is it really that unduly complex?

21      *MS. SENIA:* I think it is, Your Honor. I think it is

22   that unduly complex, because if you look at the Tenth Circuit

23   cases, yes, of course, a defendant would always want to have

24   one trial per count, but all of those cases involved one

25   victim, and the reason that that's important is because no

1   matter what else happens, if you look at *Perrault*, for example.

2   I think there were seven or eight 413 witnesses, but there was

3   only one victim, and so it's a much easier task for the jury to

4   think in their minds, there's a lot of other people, there's a

5   lot of other stuff going on, but so long as I keep that one

6   person straight, then I'm okay.  In all of those cases, as

7   well, not just *Perrault*, but every single other Tenth Circuit

8   case, there weren't as many charges in the Indictment, as well.

9           So, it's the complexity, not only the number of

10  witnesses, the number of allegations, the number of incidents,

11  but also the number of counts that makes it more complex.  I

12  also think it's a different situation than something like a

13  fraud case, where organization is easier because of the way --

14  the information that the jury has to remember.  You know,

15  there's specific dates, there's specific amounts of money,

16  there's usually expert testimony with demonstrative charts to

17  help keep everything straight, and that doesn't -- that can't

18  really happen in a sex case.  There's not a chart that we can

19  give to the jury.  There's not --

20          THE COURT:  Why not?  Why can't somebody do a chart?

21          MS. SENIA:  Well because -- you could have a chart

22  that says, *Oh, this is J.O., this is J.B.* -- it's been a couple

23  weeks, I even forget the initials -- this is J.O. this is J.B.,

24  that's what it says in the chart, but how can the jury possibly

25  remember which one is J.O. and which was J.B?  Was J.B. wearing

1  the red shirt --

2       THE COURT:  Well, I guess that's the -- what I'm

3  struggling with, with regard to this, clearly there have to be

4  discrete details relating to victims and incidents.  While that

5  may not be financial information or it may not be company X, Y,

6  Z, that was defrauded of this amount on this date, how is that

7  truly any different than a chart that indicates, for this

8  count, this was this person, on this date, in this place, with

9  these discrete factors related to the allegation?

10      It may be different than a demonstrative exhibit in a

11  different type of case, but it's really just an organizational

12  task related to discrete details.  So, I wonder how that really

13  is any different, and I will give the government an opportunity

14  to respond to that if they wish, as well here, after you are

15  done.

16      MS. SENIA:  So, the difference, I think, is that it's

17  easier to have specifics that aren't going to be in question in

18  a fraud case, like amounts of money; whereas, here it would be

19  extremely prejudicial to the defense, for the government to put

20  in their facts, without the defense getting to put in theirs.

21  So, it would have to be a chart that said, you know, *This was*

22  *the feather one that happened outside, by the bush with the*

23  *carport*, and then the defense would have to be able to put in

24  their facts as well, *This is the alleged victim that lied about*

25  *her sexual history, that slept with somebody moments before*

1   *this happened.  This is one that admitted she lied to the*

2   *police.*

3          So, you know, for it to be fair in that way, at that

4   point we're having a chart that's -- I don't know that we

5   could -- the parties could ever actually agree with what it

6   said --

7          *THE COURT:*  I'm not suggesting that this is

8   necessarily evidence that gets admitted.  Things get organized

9   in PowerPoints and the like for closing arguments, you know,

10  and each side, of course, gets within reason, if they believe

11  it's supported by the evidence, gets to prepare whatever the

12  jury is going to see for closing.  I'm not suggesting that they

13  are getting -- and of course maybe somebody tries to admit

14  something like that, but I'm not suggesting that one side or

15  the other gets to admit, unfettered, some sort of exhibit along

16  these lines, but there's lots of ways of organizing things that

17  don't include admitting exhibits either.  So, you know, you

18  could do an exhibit along those lines from the defense -- I'm

19  sorry not an exhibit.  You could do some kind of a slide in a

20  PowerPoint along those lines, outlining your thoughts, could

21  you not?

22         *MS. SENIA:*  I think the problem would still be that we

23  need the jury to have the recollection as to each specific

24  person, and that if there's qualities -- signature qualities

25  that go throughout them, the jury is not going to necessarily

1    be able to keep them straight.  So, even if our PowerPoint

2    says, *This is the feather one behind the bush*, if there's other

3    feather ones behind the bush, then how do they know which one

4    is which?  The overlapping quality here, especially with -- I

5    didn't see specific dates in almost any of the government's

6    allegations.  There weren't specifics, necessarily, about where

7    things necessarily even happened.  So, with that also being,

8    you know, an inherent aspect of sex cases, it also makes it far

9    more confusing and complicated for the jury.

10          And then I think the last thing that I would like to

11   address is this idea by the government, for the first time,

12   that these are not very different acts, these are not extremely

13   violent acts.  And they may have attempted to downplay the

14   allegations in their filing, but if you look at the actual

15   allegations in the report to the police, they are violent in

16   the way that we would think about it.  You know, allegedly

17   there were ripped shirts, ripped clothing, holding somebody

18   down, holding their legs, crying, begging, that's what we think

19   of as violence.  And there's a reason why courts don't treat

20   the allegations in the Complaint here -- or the Superseding

21   Indictment here, where there's allegations of trickery or

22   fraud, courts don't treat those crimes of violence for purposes

23   of the guidelines, for other purposes in the federal system,

24   but they do treat forcible rape of the type of the allegations

25   that are here as crime of violence, and that's telling, in

1  terms of how we, as a society, think about those crimes in

2  terms of seriousness, but also how the jury is going to think

3  about it, and I can't imagine a jury is going to be able to

4  compartmentalize extremely inflammatory evidence like that, and

5  then go on to make a perfectly rational decision, with respect

6  to all of the allegations in the Indictment.

7        We're all human beings, and there's just a limit to

8  what we can expect juries to be able to do emotionally and to

9  do logically.  I think there's so much bleeding in-between

10  those two things with allegations like this, that I don't think

11  we can possibly, with any instructions, no matter what they

12  said, prevent the possibility of unfair prejudice.  So, that

13  would be my argument on that, and I am happy to answer any

14  questions.

15       *THE COURT:*  Yeah, I appreciate that.  I think that's a

16  fair point, and we will absolutely consider the issue of

17  essentially the level of violence or the difference between the

18  acts, in terms of the argument that today, in some way, was the

19  first time the government raised that.  My recollection is that

20  it was specifically raised at our last hearing, and it was

21  raised in the context of analogizing it to another case that

22  was before this Court that was a very violent case where

23  somebody was resentenced, came back on appeal from the Circuit.

24  I can't recall who was addressing it for the defense.  It may

25  have been you, Ms. Senia, may have been one of your colleagues,

1    but my recollection is that defense counsel specifically

2    indicated they didn't know that case, so we had a brief

3    discussion about that at our last hearing.  So, today -- I

4    don't recall, off the top of my head, whether this issue of

5    level of violence or level of force was raised in the briefing,

6    but it was raised at our hearing, in person last week.  So

7    that -- there has been some previous discussion of that, albeit

8    I can't say how lengthy other than -- I specifically recall it

9    from our prior hearing.

10            *MS. SENIA:*  Yes, Your Honor.  Apologies.  My intent

11   was not to say that this was something that the government has

12   raised for the first time, it's just that if you read their 413

13   notice, you wouldn't necessarily know from that notice that

14   these were extremely violent allegations.  You can only tell

15   once you actually go and read the interviews.  So, it was not

16   to say that this didn't come up at our last hearing.  It's just

17   that we can try to recharacterize this however we want in

18   describing the allegations, but the allegations speak for

19   themselves in terms of how violent and they are alleging the

20   facts happened.

21            *THE COURT:*  Understood.  Thank you very much.

22   Mr. Graves, I don't want to invite much surreply, but on the

23   issue of organization and explanation to the jury, I did ask

24   some questions of Ms. Senia that I didn't ask of you.  So, any

25   response to those brief issues?

1      *MR. GRAVES:* Your Honor I'm a bit baffled by the

2 defense's point here, because what I understand their argument

3 to be is that somehow in a mortgage case, where a jury is

4 dealing with paper and numbers and documents, that somehow they

5 would be better to -- better able to remember that than this

6 case where a real live human being is going to come in and give

7 testimony in court before the jury.  They will remember these

8 women and will be able to parse out the testimony.  And I think

9 it's hard, when we're dealing with this on pieces of paper and

10 transcripts, as we have to at this point, this is going to be

11 live testimony; that these women don't look alike; that they

12 will likely be dressed differently.  A jury is not going to

13 have -- certainly no more challenging of a task than dealing

14 with a case involving hundreds of counts of mortgage fraud

15 where they were presented with a big binder and say, *Here the*

16 *exhibits*.  The parties, I'm sure will, and should, remind the

17 jury which people did what and what that means, and tie that up

18 to the elements from the government's perspective or from the

19 defense's perspective, talk about how they don't meet the

20 elements.  A living, breathing witness is going to come into

21 court and the jury will be able to cope with all of that as

22 they do in many other cases.

23      *THE COURT:* All right.  Thank you very much.  In terms

24 of the 413, as I indicated, we will attempt to have a written

25 order out fairly shortly.

1       That brings us the rest of our tasks.  I will tell

2  you, with regard to both the preliminary jury instructions and

3  the jury instructions, we, from my perspective -- the Court's

4  perspective, have not yet completed our task.  There is more to

5  be done.  Some of that really does come down to how long we

6  have to accomplish that task.  These are difficult issues, and

7  in many respects I think unique issues related to this case,

8  but that work is ongoing.

9       Obviously, you will have, before we go to trial, both

10  a preliminary jury instruction set, as well as, I think, a good

11  idea of where I'm heading on what I think are the core

12  elemental and definition instructions, but we're still

13  wrestling with those.  We thought it was more important for you

14  to get an order on the 702 issues first, followed by the 413

15  issues, after that, as it seems like that, in many respects,

16  more impacts the trial dates.  Obviously all of it impacts the

17  trial.

18       One area that I have become relatively settled on is

19  the idea of mental incapacitation.  There are proposed voir

20  dire questions, when I look at **Document 157**, pages 2 and 3,

21  particularly on page three, in a question that flows over from

22  page two, that's question number one, and in question number

23  two, that would indicate that a victim has to be mentally

24  incapacitated.  Further argument on -- and I don't know, I

25  can't remember, I think Ms. Woods might have been arguing jury

1  instructions when we were together last week, but I don't

2  recall, at this point.

3       So, from the defense perspective further argument by

4  whomever is tasked with this, as to why you should be able to

5  propose a question having to do with victim mental

6  incapacitation.

7       If you all both want to weigh in, that's fine.  We are

8  in a pretrial conference, I would rather have a full record

9  than be more formal, and not have somebody say their say.  Go

10 ahead Ms. Senia, and Ms. Woods if you have more to add just let

11 us know and we will get that on the record too.

12      *MS. SENIA:*  So, I think it's -- talking about the voir

13 dire questions is putting the cart a little bit before the

14 horse, in that I think we need to first make the determination

15 of what incapable of appraising the nature of the conduct means

16 as a matter of statutory interpretation.  So, if Your Honor

17 wants to talk about that, I think that's going to inform the

18 ruling.

19      *THE COURT:*  Go ahead.  I think that's a fair point.

20 Go ahead.

21      *MS. SENIA:*  So the Supreme Court --

22      *THE COURT:*  Let me just note that there has been

23 substantial briefing on this.  I have reviewed it repeatedly,

24 but I'm happy to have you add whatever you would like to it,

25 but I think there are -- this issue has been briefed, I don't

1  want to say exhaustively briefed, because it's an unusual

2  issue, so go ahead.

3        *MS. SENIA:*  Sure, Your Honor.  We did try our best to

4  make sure that you had all of the authorities in front of you

5  in the briefing.  The Supreme Court has been clear that

6  criminal statutes are not supposed to be interpreted with that

7  clever riffing by prosecutors, and what the government is

8  asking the Court to do here is to create new law, for the first

9  time in the 40 years that the statute has been enacted, to

10  allow the government to proceed with a legal theory that has

11  never successfully been done before, and that's just not what

12  criminal statutes are for.  They are not for novel

13  interpretations.  And if we look at every single tool of

14  statutory interpretation, it tells us what that phrase means.

15  So, it's not just that this has never come up before.  That

16  happens, sometimes with legal issues.  But it's that every

17  interpretive tool that we have points towards this phrase,

18  having a specific meaning, a specific legal term of art.

19        *THE COURT:*  When you say *this phrase*, just so we're

20  clear for the record, what phrase do you mean?

21        *MS. SENIA:*  Yes, Your Honor.  Starting with the

22  *incapable of appraising the nature of the conduct*, the phrase,

23  in 2242(2)(A), not only has every federal circuit always

24  interpreted it in terms of the mental capabilities, the mental

25  capacity of the alleged victim, and different types of

1  capacity.  It's not limited to just being drunk or just being

2  under the influence or just being mentally incapacitated, in

3  terms of limited intellectual functioning or permanent

4  disability, but there's some incapability that is -- the

5  alleged victim is suffering, and that the defendant has been

6  taken advantage of.  So, that comes from the dictionary

7  definitions, from the era when the statute was drafted,

8  defining incapable as an issue of capacity.  And then, of

9  course, you have appraising the nature of the conduct, and

10  appraising, the parties agree, is a mental task, judging

11  something, analyzing something.  So, we know that we're talking

12  about somebody's mental ability to judge or to analyze

13  something, just from the plain text of the statute, and then if

14  we look at the other interpretive tools, we can tell that it

15  has a narrower meaning than just that.  We look at the

16  statutory structure, the fact that subsection B talks about

17  physically, that means that A needs to be talking about

18  mentally.  If you look at 2241, a neighboring statute, that

19  talks about drugging to -- that substantially impair somebody's

20  ability to appraise or control conduct, that tells us that

21  we're talking about somebody's mental faculties.  If you look

22  at the legislative history, that's all that Congress was

23  thinking about in drafting this section, was protecting people

24  who have been taken advantage of, because they could not

25  possibly consent, because of whatever mental limitations they

1   were suffering from, at the time.  And it's not unusual at all,

2   to have certain words carry certain legal meanings in statutes.

3   That's a fairly common thing that comes up.  It just came up in

4   the Tenth Circuit last year, in interpreting the kidnapping

5   statutes.  The Courts interpreted the meaning of the word

6   *holds*, and said it carries a narrower meaning than just literal

7   holding that takes a few seconds or fleeting holding.  It has a

8   specific legal meaning.  That's the same that the Supreme Court

9   held in *Bailey*, in determining how to interpret the word using

10  in the 924(c) context.  The Court determined, doesn't literally

11  mean every definition of using you could possibly think.  It

12  has a specific legal meaning, which is that you actively use,

13  you actively employ the firearm, and so that's the same thing

14  that's happening here, is that *incapable of appraising the*

15  *nature of the conduct*, carries a specific legal meaning that's

16  evident from the legislative history, as well as state law at

17  the same time using the exact same phrase in dozens of state

18  statutes the Model Penal Code talks about how the most common

19  formulation for getting at this idea that somebody cannot

20  consent to sexual acts if they don't have the mental

21  wherewithal to do so.  The most common way to prescribe that in

22  a criminal statute is to use the exact phrase that's used here.

23          And so, Your Honor, at our last hearing, you brought

24  up this idea of Larry Nassar, and maybe a situation like Larry

25  Nassar could -- maybe those alleged victims could be incapable

1    of appraising the nature of the conduct.  Well, those crimes

2    were charged under a state statute that was about abuse of

3    power.  Abuse of power specifically over children.  And even

4    though there was a separate provision that looked a lot more

5    similar to this one, that was not the provision that the

6    prosecutors chose to charge.  It's not what he pleaded guilty

7    to.  And so while in the abstract, looking at certain

8    dictionary definitions, we could come up with a creative way of

9    how other types of conduct might fall within it, but that's not

10   our task when we are interpreting the scope of a criminal

11   statute.  The Supreme Court has been clear that, you know, we

12   need to tread lightly, that we are not supposed to take on the

13   broadest possible meaning, because of due process and ensuring

14   that people understand exactly what conduct is prohibited in

15   the statute, and that requires construing a term narrowly.

16            Finally, Your Honor --

17            THE COURT:  Let me just ask you this, because I think

18   this is logical extension of your argument, I just want to make

19   sure that we're clear about this.  So take, for example, in

20   this circumstance, we have the defendant allegedly being a

21   medical doctor, a brain surgeon, and goes in and has somebody

22   who has a brain tumor, and the physician says, you know, *The*

23   *only way I can cure your brain tumor is by having intercourse*

24   *with you right now,* and the person consents, believing that

25   that's the only way their brain tumor is going to be cured, and

1  says, *Okay, Doctor, go ahead*, and that occurs.  It appears to

2  me that the argument is that, at least under this statute, that

3  would not be a crime and could not be charged under the

4  statute.  Is that, essentially, the defense's argument in this

5  position?

6         *MS. SENIA:*  Yes, Your Honor.  It's almost certainly a

7  crime in most jurisdictions, but it is not a crime under this

8  specific statute, and that's because of the word incapable.  A

9  person who -- well, I suppose unless their brain tumor affects

10  their cognitive capacity, but assuming they have full cognitive

11  capabilities, that person is not incapable of understanding

12  that.  They can do their own research.  They can call other

13  doctors.  They can look it up on the Internet.  They can call a

14  friend and say, *My brain surgeon wants to have sex with me,*

15  *says it will fix my illness.  What do you think*?  And so that

16  sort of conduct follows within, and this is -- I want to keep

17  these separate, because I don't think there's any question that

18  this specific statute *incapable of appraising* is about

19  inability to consent, and the legislative history couldn't be

20  clearer on this, that where consent mattered, Congress put it

21  specifically in the text of the statute.  So 2244(b), that's

22  the *without permission*, and we will talk about that jury

23  instruction in a second.

24         But this instruction is supposed to have nothing to do

25  with consent.  So it's not whether the person could consent to

1  their brain surgeon.  It's whether they were capable of

2  consenting, and unless there's some problem with their mental

3  faculties, they are capable of making that determination.  They

4  might make the wrong one.  They might be tricked.  They might

5  be confused.  They might not exactly understand.  But that

6  doesn't mean theory uncapable of it.  The example I gave in the

7  briefing is I don't know anything about Formula One, but I'm

8  not incapable of learning about Formula One.

9       So that's -- the brain surgeon analogy, the victim

10  might be -- might fall for the trick, and might not understand

11  that it's a trick, but she is not incapable of understanding

12  that it's a trick, and so that's the distinction.

13       *THE COURT:*  I think the question is, why is incapable

14  not a transient circumstance based on lack of knowledge?  Why

15  is it something else in your mind?  Essentially, you know, the

16  way I take your argument is, incapable doesn't mean a lack of

17  current information that could be remedied by study or

18  questioning.  Incapable is something having to do, essentially,

19  almost disability, for lack of a better word.  Inability,

20  perhaps, to ever understand, to ever remedy that circumstance,

21  because you couldn't go out and ask the right person another

22  doctor, Google, whatever that may be, and get the answer.

23       *MS. SENIA:*  So I don't think it's that you could never

24  understand, because it would also cover temporary

25  incapabilities like being drunk or intoxicated.  So, why do

1  I -- why is that my interpretation?  Because that's what the

2  word means.  It means -- incapable means unable or you are

3  lacking the capacity.  And so if we interpret it to just mean

4  lack of understanding, then we are reading an entire word out

5  of the statute.  Even -- you know, even if we ignore all of the

6  other legislative history, all of the other interpretive tools,

7  just the plain meaning of the word has to have some effect, and

8  it has no effect if we're asking just about -- or if we are

9  characterizing it as a lack of understanding versus an

10  inability to understand.  Incapable has to be doing some work

11  in the statute.

12        So -- and I think also what's telling is that if you

13  look at 2242(3), which is a provision that Congress added in

14  2022, it prevents engaging in a sexual act with another person,

15  without their person's consent, to include doing so through

16  coercion, and so it's telling that Congress added this

17  provision, because it thought that there was a gap in the

18  statute, and there wouldn't be a gap in the statute if the

19  government's reading were correct, and it were based purely on

20  consent.

21        So I think that tells us that one and two have to be

22  about inability to consent.  They have to be about something

23  that's different than consent.

24        And I think the last argument that we would make is

25  that if the Court, after looking at the legislative history,

1  the dictionary definitions, every single federal case to ever

2  talk about it or interpret the statute, all of which talk about

3  incapacity, all of the federal jury instructions would

4  characterize this subsection as about incapacity.

5      If the Court still is unsure and thinks that the

6  meaning of the statute is ambiguous, then the Court then will

7  need to apply the rule of lenity, and under that rule if

8  there's an interpretive tie, where the defense could definitely

9  be correct, because of all of those tools of interpretation,

10  but the government has some points on their side too, then the

11  interpretive tie cuts against the government and has to be

12  construed in favor of the defense, and so that's what we would

13  ask for as our alternative last-resort argument, that if the

14  Court is still unsure about how all of these things

15  ultimately -- how this ends up, there's an interpretive tie,

16  then the Court should rule in favor of the defense in breaking

17  that tie.

18      THE COURT:  All right.  Thank you.  I think it

19  probably makes sense to address these statute by statute.  Any

20  problem, Ms. Senia, with that?  If I turn to Mr. Graves for

21  argument on 2242(2)(A), then I will come back to you for your

22  next statutory argument?

23      MS. SENIA:  Yes, Your Honor.

24      THE COURT:  All right.  And I presume Mr. Graves, but

25  it might be Mr. Player, whoever wants to address 2242(2)(A).

1       *MR. PLAYER:* Capable of appraising, correct,

2    Your Honor?

3       *THE COURT:* Yes. Sounds like Mr. Player is going to

4    be addressing that.

5       *MR. PLAYER:* I see it's 12:06. We're scheduled to go

6    until 1 o'clock. I think I had 1:30 as our stop time, but I

7    think it probably depends, frankly, on Tammy's schedule, as

8    well as the attorneys'. I was supposed to get in a car and

9    drive to Denver, 1:30/2:00 this afternoon, for a preliminary

10   injunction hearing in the morning, but the parties moved that

11   off a number of months. So, my inclination is to go as long as

12   we need to. We can take a break or something if folks need it,

13   but to hash through as many of these issues. So let me just

14   ask it in this way, is there anybody that has a time limitation

15   that is going to be problematic?

16      *MS. SUELAU:* Your Honor, I have a medical appointment

17   at 3:15.

18      *THE COURT:* If we're still going at 3:15 -- you

19   probably need to go out of there by 2:30 or so, to make that.

20      *MS. SUELAU:* 2:45 would be plenty of time.

21      *THE COURT:* Anybody have anything sooner than that?

22   Okay. So I would propose that we go to about 12:30, then take

23   about a ten-minute break, and then come back and keep rolling,

24   unless people need more than that. That will have us at about

25   an hour and a half. If anybody needs a quick restroom break or

1   something.

2           Is that good with you, Tammy?

3           (Reporter nods in the affirmative.)

4           THE COURT:  Go ahead, Mr. Player.

5           MR. PLAYER:  First, I will address the issue that you

6   raised about the transitory nature of this was phrase, and the

7   phrase --

8           THE COURT:  Sorry.  I was just asking Don to turn up a

9   bit.  You were a little bit soft.

10          MR. PLAYER:  Can you hear me now?

11          THE COURT:  Yep, that's better.  Thank you.

12          MR. PLAYER:  The phrase that we're discussing is

13  *incapable of appraising the nature of the conduct*, and I think

14  that the incapable necessarily has to be in the moment of the

15  conduct, and I think that is evident by the fact that there are

16  circumstances under which both the legislative history and the

17  case law recognizes that that phrase can be applicable when

18  somebody is intoxicated or potentially sleeping, because those

19  individuals are in that moment incapable of appraising the

20  nature of the conduct, but they could wake up or be woken up or

21  become sober and then be able to think clearly about some other

22  incident or even look back upon the incident.

23          So when you consider the legislative history and the

24  case law, it's inherent that the incapable language needs to be

25  tied to the moment under which the victim is assessing the

1    situation.  And essentially, the nature of the crime does

2    require that assessment to be applied for each independent

3    evidence of a sexual assault.  So if there were multiple sexual

4    assaults, the jury would need, necessarily, to appreciate

5    whether or not the victim was incapable of appreciating, in the

6    moment, for each separate incident.

7         There's a reference to the Formula One hypothetical,

8    and Ms. Senia may not understand Formula One, and she may lack

9    understanding about the rules of Formula One racing, but she is

10   not incapable of understanding the rules, but the question is

11   not whether a person could figure the rules out eventually,

12   it's whether they are capable or incapable in the moment.

13        Consider a more classic example, where the question is

14   not whether a highly intoxicated person could figure out what

15   was happening during a sexual act.  It's whether they are

16   capable of appraising it in the moment.  I have talked about

17   that.

18        Now, imagine this, let's say that a person is gone to

19   a Formula One racing event, and they have gone there knowing

20   nothing about the race, but they've gone there with their

21   friend, who is a Formula One fan.  This person talks about

22   Formula One all the time.  They wear Formula One shirts.  They

23   have got Formula One hats.  They talk about why this works, why

24   that didn't work, who the driver is, who the driver isn't, and

25   then that fan, that friend, says to the uneducated person,

1    about Formula One, because of this certain particular aspect of

2    the car, you should go bet a hundred dollars that this car will

3    win, when in fact the thing on the car will actually cause that

4    racer to lose.  The bet has to be placed right now.  That

5    person is incapable, because they don't have any knowledge

6    about whether that fan or that part of that car is going to

7    work, of truly understanding and appraising the nature of the

8    conduct, which is whether this was car will be successful.  It

9    is inherent to whether or not the person, and in our case the

10   situation, the victims, understand the entirety of the material

11   facts for which they are making that decision.

12        *THE COURT:*  Let me ask, Mr. Player, then where does

13   then, essentially, the notion of personal responsibility bear

14   on that?  Essentially if, you know, to what extent and in what

15   context, if at all, does a person have the ability to rely on

16   what somebody else tells them?  You know, however absurd that

17   information might seem, does that bear on this at all?

18        *MR. PLAYER:*  Um ... I think it does, and I think it

19   goes back to the circumstances.  So, for instance, if you ran

20   into a person at the super market and that person heard you

21   cough, and said, *Hey, by the way I'm a doctor*, but they're not

22   wearing scrubs, and they say, *I live over here at the hotel,*

23   *come over to the hotel and visit me, and I will treat you with*

24   *medicine*.  I think then if the person -- if the person seeking

25   the treatment went there, knowing nothing more than that, I

1    think you could say, look, that person weighed their ability to

2    know the nature of the conduct, and under the circumstances,

3    under those facts, they were capable of understanding the

4    conduct because they -- it was reasonable to conclude that this

5    person was not, in fact, a doctor that could provide the

6    treatment.  So that renders them capable of understanding,

7    under the circumstances of the conduct.  It's not reasonable to

8    think this person is a doctor, and so under the circumstances,

9    I could have analyzed this and said this isn't truly what it's

10   being purported to be.

11            *THE COURT:*  Okay.

12            *MR. PLAYER:*  This provision, this *incapable of*

13   *appraising*, reasonably and necessarily and frankly simply

14   covers the field of sexual abuse when the victim is unable to

15   appraise the nature of the conduct, and this is a simple tenet.

16   If person A knows that person B does not know all of the

17   material facts about the conduct, including the intent of the

18   person engaging or offering the conduct, it is not legally

19   allowed -- the perpetrator is not legally allowed to exploit

20   those circumstances for acts of sexual pleasure under this

21   statute 2242(B).  This includes, priests, making statements

22   that are untruthful for sexual pleasure, doctors, spiritual

23   healers, masseuse, and these type of scenarios, have been

24   commonly understood or known to have occurred for years before

25   the 1986 update and modernization of the sex assault rules.

1  This is very carefully chosen language that rather than cut out

2  a whole series of various events in modernization, they chose

3  this language very specifically to cover all of those

4  circumstances, and it also is smartly drafted to incorporate

5  issues relating to people in positions of authority and

6  circumstances under which a victim is unable to understand a

7  situation and because a defendant knows the victim is unable.

8      The fact that the statute requires that the defendant

9  know the victim is unable, that addresses the concern that this

10  statute could potentially make criminal conduct that might

11  otherwise be innocent.  This statute also requires that the

12  defendant understand that the victim is unable.

13      And if you look at the *Guardia* case, 10 F.Supp 2d

14  1237, from Mexico, I think Judge Black, in that case, was right

15  on the continuing evolution of the sex offense statute, and he

16  cites to and recognizes that this statute that we're dealing

17  with was enacted to modernize and criminalize the widest

18  possible variety of sexual abuse in all forms, and draw the

19  focus of the law back towards the actions of a perpetrator and

20  away from the responses of the victim.

21      In regard to the statutory rules of construction, one

22  such rule is that statutes are to be given their plain meaning,

23  and we assert that the government's instruction does just that

24  and.  In fact, The *Earls* Court, who uses the Third Websters

25  International Definition for a portion of this phrase, is the

1  language that was used in our proposed instruction to answer

2  the remaining definitions to help the jury.

3      *THE COURT:*  What are your thoughts on how this is

4  different from Subsection 3, which I will just broadly call the

5  coercion subsection?

6      *MR. PLAYER:*  That is a great question.  Now, when

7  the -- this statute was drafted 2242(B), the Congress was

8  trying to get away from the idea of consent being a focus,

9  taking consent away from those offenses.  Then after the events

10  in our charges, they come out with this idea that we're going

11  to add an additional consent prong.  My argument to the Court

12  is that can have address a separate type of sex offense that

13  Congress thought may not have been covered by this language,

14  but this language --

15      *THE COURT:*  For example, what would that be?

16      *MR. PLAYER:*  Could be simply a strong -- a rape --

17  well, 2241 involves strong-arm rapes.  It could be a incident

18  of sexual intercourse that does not meet the alternative prongs

19  of the 2244(b) of touching, and so it gives an option to file a

20  nonconsent, but sexual intercourse charge there, and in that

21  case you may also be having to deal with the definition of

22  consent like we're dealing with permission here.

23      It could be a situation involving money or a person

24  who is compelled by a debt to have sex.  You know, *You owe me*

25  *so much money and if you don't engage in this behavior I'm not*

1    *going to forgive your debt.  We are going to come collecting*

2    *for you*.  Potentially some other sort of threat.  A lesser form

3    of a threat.  I know that's covered partially in 2241.  So I

4    think it just broadens and clarifies some options there, but I

5    don't believe that it is a reflection that the statute we've

6    charged, does not cover the opportunity -- or the incidents

7    where a person is incapable in the moment, and even further, in

8    our case, where that -- the information known is created by the

9    defendant.

10          I'm concerned about the defense's reading of the

11   statute, because it actually seeks to include language in the

12   statutory requirements of mentally incapacitated, which was not

13   drafted by Congress.  They left it simply *incapable*, without

14   any mental restriction on that language for the reasons I have

15   discussed.

16          And defendant's reading of the statute interpretation

17   would not allow a person to go to a doctor, when the doctor

18   touches that person with the intent to serve their own sexual

19   interests or arouse or gratify their sexual desires to have a

20   prosecution pursued against them, and I don't believe that --

21   and this is just common sense -- that when Congress -- Congress

22   is seeking to expand the reach of sexual abuse statutes, that

23   they would not address a situation where somebody goes to a

24   doctor, and the doctor engages in touching for their own sexual

25   pleasure, and say that that doesn't violate these sexual

1  offenses, just that, Your Honor, just seems illogical to me.

2        There's some reference to the Illinois cases

3  evaluating a similar statute, and it's true what the defense

4  writes, is that the final holdings, to unable to give consent,

5  but I reread through some of those decisions today, and there

6  are several instances in those decisions when they are doing

7  their analysis, where they use the *unable to understand the*

8  *circumstances* phrase, right along side with the *unable to give*

9  *consent* phrase in those cases, and I think that's telling,

10 because I think that is a demonstration of the policy behind

11 those statutes.

12      THE COURT:  What bearing do you think I should give

13 those Illinois cases, if any?  I mean, how are they applicable

14 to this Court in this circumstance?

15      MR. PLAYER:  The value of them is that the phrasing

16 the statute they use is similar, and it just shows the logic of

17 their analysis.  So I think the logic could be helpful to this

18 Court.  I think it's also important to note that Congress was

19 trying to get away from the common law restrictive boundaries

20 on potential sex offenses, and so yes, many jurisdictions, at

21 that time, had the more archaic, more restrictive sex offense

22 statutes and crimes, Congress wanted to move forward, and I

23 think the Chicago case is also an example of another

24 jurisdiction also moving forward and widening the scope of

25 sexual offense potential crimes, that focus more on the

1    behavior of a defendant and less on the reaction of the

2    victims.

3            Your Honor, do you have any questions for me?

4            *THE COURT:*  I mean, none other than the ones I have

5    thrown in as you have gone along.  Nothing else.  Let me turn

6    to Ms. Senia for a brief reply on 2242(2)(A), and then I will

7    take a brief recess and come back and move on to the next

8    statute.  Ms. Senia.

9            *MS. SENIA:*  Yes, Your Honor.  So, to start, I suppose,

10   with the plain meaning, the government says that they use the

11   same dictionary as the Tenth Circuit did in *Earls*.  What they

12   admit, however, is if you look at those dictionary definitions,

13   and I am happy to file a copy of them with the Court, it was

14   1986, might not be lying around, but every single other

15   definition of that word, that the government does not mention,

16   has to do with mental incapacity or incompetence, mentally.  So

17   we can't just cherry-pick one of the definitions out and ignore

18   the broader context of the rest of the definition, which talks

19   specifically about incapabilities mentally.

20           So then go to the legislative history.  To be clear,

21   when the portion of the legislative history that the government

22   cites, it talks about the Congressional intent is to widen

23   possible sex abuse crimes.  If you look at that legislative

24   history, what Congress is talking about is the fact that before

25   this act, federal -- the federal sex statute only proscribed

sexual intercourse.  It doesn't proscribe any other type of

sexual touching, and so Congress goes on to say, so we have

expanded the statute to include other forms of sexual touching;

such as, oral sex, digital penetration, the like.

So it's not that Congress was saying we intend to make

every conceivable sex crime a sex crime, even when we have not

expressly mentioned it in the statute at all, I don't think

that would be constitutional, but that was also not the

legislative intent, and we know that because if we look to the

Uniform Code of Military Justice, and that is 10 U.S.C. 920,

obviously an act of Congress, uses very similar language to

what we have in our statute, if not identical language.

Legislating in the same sphere.  Talking about sexual assault

crimes.  Also an act of Congress.

If you look at that statute, subsection 7 -- oh sorry,

subsection G 8, it defines incapable of consenting.  Says, *The

term incapable of consenting means that the person is incapable

of appraising the nature of the conduct*, that's the exact same

language that we have here, and so that tells us that it's not

just about a lack of understanding, but that you cannot

consent, and it also goes on to talk about that you can't

consent if you are an incompetent person.

So I agree with the government, that when we're

talking about *incapable*, we're talking about in the moment.

That's true.  There's no dispute about that.  But what has to

1  be wrong in the moment, is that that person cannot possibly be

2  able to consent, and the government says that this subsection

3  was supposed to cover the fields, yet it can't point to a

4  single case in 40 years where this was the government's theory,

5  and that's -- it just blinks at reality to suggest that that

6  would be the case, if it was supposed to cover the field.  And

7  it also doesn't explain why Congress then added a subsection

8  about consent.

9       The government tried to come up with an example, but,

10  you know, their definition of incapable, lacking the power to

11  appraise something, judge the significance of something, that

12  would be the same thing as somebody who is subject to coercion,

13  which is what subsection three prohibits.

14       So, it doesn't make sense that Congress would have had

15  nestled in (2)(A), something that was supposed to be so broad,

16  that it could actually cover the entirety of that statute as a

17  whole.

18       THE COURT:  Ms. Senia, let me ask you this, it appears

19  to me that coercion and essentially trickery are different

20  concepts, different circumstances, and it clearly, subsection

21  3, addresses coercion, that consent isn't consent if you are

22  coerced into it, but how is that not different from essentially

23  the idea of trickery, because of knowledge in some fashion?

24       MS. SENIA:  So turning back to the Uniform Code of

25  Military Justice, that code also has a specific section about

1  trickery, and -- two sections about trickery.  It proscribes

2  making a fraudulent representation that the sexual act serves a

3  professional purpose, and that inducing a belief by artifice,

4  pretense or concealment that the person is another person, and

5  this is really important, because if you just have a statute

6  that broadly proscribes any kind of trickery as to any material

7  fact, as the government says, you run into very serious

8  line-drawing problems really fast, and this is seen in all of

9  the law review articles and all of the treatises; is that, you

10 start asking, okay, a material fact; is that to either party?

11 And what if a material fact is how tall you are?  Where you

12 went to school?  What religion you are?  And if that's a

13 material fact, which it very well may be to a lot of people who

14 decide to engage in sexual contact with others, then all of a

15 sudden we're creating crimes where people could go to prison

16 for lying about things that people lie about all the time.  And

17 you know we might -- we might think it's wrong to lie about

18 that, but for due process reasons, we have to give people

19 reasonable notice about what they can and cannot do, and if you

20 read a statute so broadly to proscribe any kind of material

21 fact, then it's impossible for people to tell what's legal and

22 what's not, and it also explains why not only Congress, itself,

23 when it wanted to make more specific things be legal, it wrote

24 specific statutes telling them they couldn't lie about a

25 professional purpose, telling them they couldn't pretend to be

1    another person, but that's how states do it too.  Is that when

2    all of this started happening with more an more frequency in

3    the 60s and 70, state legislatures acted to create specific

4    statutes to talk about abuses of power, to talk about trickery,

5    to talk about fraud, and we may think that's a really good

6    idea, but the question is, has Congress done that here in this

7    specific statute?

8            And so Mr. Player might think that it doesn't make any

9    sense, because they should be able to charge that, and we can

10   agree, but we have to ask what this specific statute allows,

11   and so it's not at all unusual that you have to interpret a

12   statute to mean something that doesn't have express words in

13   the statute.  The government said, you know, we want to -- we

14   want a limitation that's not in the language of the express

15   statute, that was the exact situation that the Supreme Court

16   case *Bailey* with 924(c), and that was the situation here -- in

17   the Tenth Circuit with the *Murphy* case, where the government

18   similarly said holds means holds.  It's any type of holding.

19   That's what the ordinary meaning is.  Why is the defense trying

20   to add a limitation that's not in the express text?  And the

21   Tenth Circuit said, well, because otherwise it would sweep in a

22   whole host of things that we don't think the statute should

23   sweep in.  So we have to look at what we think the statute was

24   intended to cover, what Congress meant for it to cover, and

25   look at the language in the context of the rest of the statute,

1    and the Tenth Circuit said, holds doesn't literally mean holds?

2    It means holds for an appreciable period of time, and so that's

3    a similar thing that we're asking for here, which is, we're

4    just asking for construction that every other Court that's ever

5    looked at this language has done, which is to say this person

6    was incapable of consenting, and that was because of some

7    mental defect or limitation.  And it could be transitory, I

8    completely agree with the government.  It has to be in that

9    moment, but were they in that moment, unable to understand what

10   was happening?  And we can't just accept the government's

11   clever riffing on language for a criminal statute for

12   constitutional reasons.

13        *THE COURT:*  Okay.  Well argued by both sides.  As I

14   indicated, we will take a short break.

15        Tammy, are you good with ten minutes?

16        *THE COURT:*  All right.  We will get back together.

17   Thanks everybody, at 12:46.

18      (Recess at 12:35 p.m.)

19      (In open court at 12:46 p.m.).

20        *THE COURT:*  All right.  Mr. Wall is here, we're back

21   on the record and moving on for further discussion of potential

22   jury instructions, this is 24-cr-3.

23        Where do you want to head next, Ms. Senia?  I suspect

24   it's in the nature of an argument regarding the statutes in

25   permission, but is that where we are heading next?  Just so we

1  are clear, which statute or statutes do you want to argue in

2  the context of that?

3    *MS. SENIA:* So that is 2244(b).

4    *THE COURT:* Okay. I'm not sure where -- somewhere we

5  have some background noise, just so we make it easier on

6  everybody, other than Mr. Wall, who can't maybe just mute

7  yourself, and maybe that will address the background noise.

8    *MS. SENIA:* So just to start, I want to make sure,

9  because I think it's really easy for the doctrine to have

10  slippage 2242, *incapable of appraising*, and this statute about

11  permission, but they have different language and they have

12  different requirements, and so while the statute we just talked

13  about, is about somebody who, for whatever reason, however you

14  want to define it, cannot consent, so the law, you know, you

15  could have somebody who purports to consent, but we, as a

16  matter of law, have said, you know, in drafting the statute

17  that this person cannot consent. So we're not even looking at

18  that.

19    This statute does have to do with consent, with

20  permission. And the parties appear to agree that what we're

21  really looking at here is this idea of fraud in fact versus

22  fraud in the inducement, and fraud in fact is really kind of a

23  misnomer, because it sort of suggests that there might be

24  situations in which you have consented, but you fraudulently

25  consented, so we're not going to count it. It's actually just

1  that you haven't consented at all.  That's what fraud in fact

2  means, because you go in, you know the stereotypical case that

3  happens is somebody goes for a gynecological exam, the doctor

4  says I'm going to, you know, insert a speculum, puts up a

5  sheet, and then the person, the victim, realizes that he has

6  substituted his penis for the speculum.  There's no consent,

7  because that person did not consent to penetration by a penis,

8  that's why that is fraud in fact.  No consent at all, and

9  that's why, traditionally, in states that had -- at least that

10  had nonconsensual sex statutes, that's how they defined rape,

11  that's why those cases are considered to be, you know, just --

12  they just fall within the plain language of the statutes,

13  because it says you need consent, this person has not consented

14  to the physical act that actually occurred.

15        So that's what the government purports to be applying,

16  that's the doctrine, but what they're actually applying is the

17  fraud in the inducement doctrine.  There was no consent,

18  because there was never any agreement to a physical act that

19  actually happened.  In fraud in the inducement, there is

20  consent to the physical act that happens, it's just that that

21  person that gave the consent did so under false pretenses.

22  They were --

23        THE COURT:  Let me stop you, Ms. Senia, and just -- I

24  will certainly give you a full opportunity, but just we're

25  specifically applying this to at least one version of what the

1    facts could be in this case, of course there's lots of

2    different angles that could come out, but if the facts truly

3    are, I am a doctor, I need to do this to heal you, and the

4    person says, *Yes, go ahead*, that is fraud in the inducement and

5    would not be violative of 2244(b?).

6         *MS. SENIA:*  That's exactly right, Your Honor.  And

7    again, we might have a lot of problems with that.  We might

8    want that to be illegal, but the question is, *Is it illegal*

9    *under the statute*?  And the government has conceded that fraud

10   in the inducement is not covered under the statute, so really

11   the question is, where do we put that, that sort of fraud?  And

12   we can look to the *Bellow* case out of California, and the

13   *Bolsinger* case out of Ohio, and not because state law applies

14   here.  State law does not apply here.  There's -- hasn't been

15   argument by the government that state law is supposed to apply

16   here, but just because they apply these doctrines, and it's

17   helpful to see how they apply them, to have factual

18   circumstances for us to be able to understand where the lines

19   are here.  And so in the *Bellow* case, I read it in law school,

20   I think a lot of people did, it's the stereotypical

21   sex-by-fraud case, where the doctor says, you -- *I'm a doctor.*

22   *You have an uncurable disease.  You can either have this*

23   *extremely expensive surgery or there's actually been a donor*

24   *who has been injected with the antidote that you need, but you*

25   *have to have sex with him, because that's how he can give you*

1  *the treatment*, and in that case the woman consented, California

2  says, you know we find this deplorable, but that doesn't mean

3  that you didn't consent.  You consented.  It's just that you

4  did so under false pretenses.  California actually enacted a

5  statute after that to make sure that was illegal, and I think

6  the same defendant actually was caught again doing the same

7  thing, and he was charged under that new statute, but that's

8  the stereotypical situation of fraud in the inducement.

9        The *Bolsinger* case offers other helpful examples,

10  where it was a camp counselor who pretended to be having exams

11  to look for testicular cancer and other maladies.  The alleged

12  victims consented, and the Ohio Supreme Court said, look, there

13  was consent, because you understood the physical act that was

14  going to happen.  You allowed that physical act, even though

15  you were tricked as to the reason.  That's not what falls in

16  within a statute that purely just proscribes nonconsensual

17  touching.  And so that's all that we have here.

18        If you look at the Model Penal Code, you look at the

19  treatises, you look at the cases, all of them draw that

20  distinction between, *Was there consent to the physical act*?  *If*

21  *yes, then we are in a fraud in the inducement as to everything*

22  *else, and states, y'all should enact statutes that are more*

23  *specific if you want to get at anything else*.  And the reason,

24  again, is because of this line-drawing problem, because

25  somebody could lie about all sorts of things, and we might not

necessarily want all sorts of things that someone can lie about
to fall within the scope of a criminal statute.  We might
morally find them reprehensible, but we may not want to
criminalize them.

So, with the government's approach, if you look at
their jury instruction, they talk about misrepresentations as
to the fundamental nature of the conduct, and that's the
problem; is that, what does fundamental nature of the conduct
mean?  It's standardless.  We don't know.  But the defense jury
instruction is very specific and talks about, you know, if it's
induced by trickery or deception, misrepresentation, then it
doesn't vitiate consent, and that's exactly what the fraud in
the inducement argument is, and the government has conceded
that that would not be covered under this statute.

So I'm happy to answer any questions.  I think if you
look at every single case cited by the government, they fall
into two camps, either they are real fraud-in-fact cases,
because there was a lie about the physical act that was going
to happen, or there's -- they are in jurisdictions primarily in
Illinois, that they have a state rule that fraud in the
inducement counts.  And so, that's specific to Illinois.  We
might think that's a good idea, but there's never been any case
that says that that's what the federal definition is, and the
government has conceded that it doesn't cover fraud in the
inducement.

1          So, those cases, we might want them to apply

2    everywhere, but they don't, under the approach that, of course,

3    we all have to follow here under federal law.

4          THE COURT:  All right.  No questions, Ms. Senia.

5    Thank you very much.  Either Mr. Graves or Mr. Player?  I'm not

6    sure who is going to tee this one up.

7          MR. GRAVES:  That's me, Your Honor.

8          THE COURT:  I will come back to you, Ms. Senia, for

9    the final word.  Go ahead, Mr. Graves.

10         MR. GRAVES:  I think, to a certain extent, the parties

11   are talking past each other in framing up this debate.  The

12   fraud in the fact and the inducement dichotomy is interesting,

13   and I will get to that here in a second, but the Court does not

14   need to go any further than the plain text of the statute, and

15   this is something at the top of our brief, by any definition,

16   by any common sense meaning of the term, permission means

17   permission to do something specific, not anything, not a blank

18   check, but there has to be an agreement to allow someone to do

19   something.  To put it in the common law parlance, to the

20   factum, right?  Like, what is the thing that you are agreeing

21   to?  And that --

22         THE COURT:  So, let me just give you a hypothetical,

23   because I just, kind of, discussed this with Ms. Senia.  So, if

24   the permission was, *You may heal me*, then if the defendant knew

25   that sex or touching or penetration wasn't going to heal, that

1 would not be permission, even if the victim says, *You may put*

2 *your finger in me to heal me*, which is, at least, one

3 interpretation of the facts in this case.

4   *MR. GRAVES:* I think that's exactly right, Your Honor,

5 and the reason for that here is, looking at this statute, is

6 what is criminalized, is not in the words of defense counsel,

7 nonconsensual touching. It's nonconsensual touching with the

8 intent to arouse and gratify the sexual desire of any person.

9   So, if somebody gives permission to an act, that has

10 an entirely different intent, their permission does not flow to

11 the same act with a different intent, and that's no different

12 to many other parts of the criminal law, where the intent is

13 fundamental to defining whether or not it's criminal. So, the

14 factum, the thing that someone has to give permission to, is

15 sexual contact, which means touching of specific places, with

16 the intent to arouse and gratify the sexual desire of any

17 person.

18   If someone gives permission for touching, with the

19 intent to -- for a doctor's purpose, for someone, you know, has

20 trouble using the bathroom, to help them wipe, something to

21 that effect, that would not be a crime, because of that

22 limitation that's provided by the statute itself.

23   So, when a person misrepresents the fundamental nature

24 of what they're doing, by telling someone, *I am touching you*

25 *with the intent to heal*, causing that person to say, *Okay. I*

1  *give permission to do that*, and then they do the thing.  That

2  permission was not valid.  It was not what is meant under the

3  statute.

4  The defendant does not make -- does not spend really

5  any time at all on the text of the statute in their brief, but

6  I think it's important that the permission must be for

7  something, and if the something is different than what was

8  represented, there just is no permission.

9  The defense uses the example of a massage therapist,

10  that if they touch somebody, and their intent, the masseuse,

11  their intent -- one of their intents, at least, was for sexual

12  desire, and the other person had not given permission to do so,

13  that would indeed be a crime.

14  Now, of course, the government would have to prove

15  that.  You know, again, those are things that are dealt with by

16  circumstantial evidence in every instance, because you use

17  circumstantial evidence to determine what someone was thinking.

18  But here it's pretty clear cut, because, in many, if not all of

19  the instances, Mr. Wall told the alleged victims that this was

20  not -- specifically, *This was not something that I am doing*

21  *with a sexual purpose.*

22  It's really no different than the textbook example of

23  theft, that I was taught in law school, that if you are

24  somebody at the store, and you pick up an object from the

25  shelf, and at that moment that you pick it up, you intend to

1   permanently deprive the store of that object, then you have

2   committed the act of theft in a moment, even if you have

3   actually not left the store with the object.

4        Of course there's, again, a proof problem, but when

5   the actus rea meets the mens rea, at the same time, the crime

6   occurs.  So, to the extent the defendant's argument is that

7   intent matters, our response is, yes, that's true, for nearly

8   every possible criminal statute, and any specific intent

9   statute, that intent critically separates innocent conduct from

10  crimes, and obviously, if the defendant touched these women

11  during a gynecological exam, with the intent to provide

12  treatment, then that's not a crime.

13       Far from a thought crime, as proposed by the

14  defendant's brief, a person who actively misrepresents

15  themselves to procure permission, performs an act, and then in

16  the performance of an act that requires permission, combined

17  with the intent specified in the statute, commits a very real

18  crime, and that can come as no surprise to anyone.

19       I want to briefly touch on the fraud in the factum,

20  versus fraud in the inducement doctrines from common law, to

21  the extent that's really helpful or informative on the Court,

22  which, I think, as pointed out in a footnote in our brief,

23  there's limited parallels, because these are common law

24  doctrines that were oftentimes used to determine whether or not

25  a woman resisted or whether there was force applied.  So

1    there's limited application here.  But the bottom line is that

2    the women were not giving permission to sexual contact.  That

3    is the factum that's important here.  They were unaware that

4    sexual contact was occurring.  They were aware touching was

5    occurring, but they were unaware that it was sexual in nature.

6    They believed, because they had been actively and strategically

7    led to believe that that conduct is for healing.

8         Now, this is different, and importantly so, from the

9    *Bellow* case.  There, the women understood they were having sex,

10   like the doctor said, *Hey, we're going to have sex*, and that is

11   for this nefarious purpose, fraud in the inducement, but there

12   was no doubt about what was occurring, it was a sex act,

13   everybody was clear about that.  There's no such understanding

14   here.

15        The defendant was touching these women, digitally

16   penetrating them, for example, and actively telling them

17   *There's no sexual intent here*.  *There's not a sex act that is*

18   *occurring*.  The women are not agreeing to the fact of what has

19   happened.  I think this formulation is well made by the Seventh

20   Circuit in the *Desnick* case, where they described the woman who

21   was victimized by a medical impersonator has no desire to have

22   sex with the doctor.  She wants medical treatment.

23        *THE COURT:*  Let me ask, Mr. Graves, because this issue

24   might be raised, as it applies to your -- at least one, maybe

25   two of your 413 incidents, where there's an argument that, *We*

1    *need to exchange energies*, which was ejaculation, allegedly by

2    Mr. Wall; how is that not similar to the *Bellow* case?

3       *MR. GRAVES:* Your Honor, it's similar to the *Bellow*

4    case because my understanding of the facts of *Bellow*, is that

5    there was no dispute that there was a sex act that was going to

6    occur. Here, despite appearances, the defendant repeatedly

7    reassured these women that whatever it looked like, this is not

8    a sex act. This is healing. Now, the women were -- believed

9    that and gave permission on that basis. They didn't want to

10    have sex with Mr. Wall. What they wanted was healing. And I

11    think it's important that we don't conflate the act as solely

12    the physical act, because that's not what the statute that

13    we're dealing with here tells us. The relevant act here is the

14    physical act, the touching, combined with the intent to arouse

15    and gratify the sexual desire of any person.

16       If they didn't understand that, if the women didn't

17    understand that -- now, I'm sure the defense will argue at

18    trial that they did or that they, you know -- didn't have the

19    wool pulled over their eyes, but if they truly didn't

20    appreciate there was an intention here to arouse and gratify

21    the sexual desire of any person, then they did not consent to

22    the fact of what occurred. It's not just that they were

23    seduced into having sex for nefarious reasons. There was a

24    fundamental different understanding as to the nature of the act

25    that was taking place.

1          I think this flows to the analogy used by the defense

2     of the inferred boyfriend.  There, the girlfriend consents to

3     sex, albeit for fraudulent reasons, that's fraud in the

4     inducement.  They were aware that a sex act was occurring,

5     which is not, at least from the government's perspective, what

6     happened here.

7          So I think in a certain sense the parties are talking

8     past each other on the distinction, which is somewhat fuzzy

9     between fraud in the inducement and fraud in fact.  But I don't

10    think this Court needs to really venture any further than the

11    language of the statute, that if a person gives permission to

12    an act, that permission is limited to that act, and if what

13    they gave permission to was not an act that -- that included

14    the intent to sexually gratify somebody, to arouse someone's

15    desire, then that permission does not -- is not valid, and the

16    jury should be so instructed.

17         Does the Court have any other specific questions?

18         THE COURT:  Yeah, I think the other question, and I

19    will turn back to Ms. Senia about this, as well.  The example,

20    I think, in one of the last of the briefings, I can't recall if

21    it was 189 or 190, was essentially the example of the massage

22    therapist, who essentially was massaging someone's buttocks,

23    may well have been doing so for therapeutic massage purposes,

24    but at the same time simultaneously was sexually gratified by

25    that.  I suppose that in some sick or perverted way that same

1  example could go to a gynecologist who is performing medically

2  necessary treatment, but is also at the same time sexually

3  gratified by that.

4  How would you separate that out from a circumstance

5  where there's no medical purpose?  And then, throwing in the

6  final wrinkle, because it's something that may end up getting

7  argued later, it hasn't yet been in this argument, but the idea

8  behind somebody's sincerely held religious beliefs, as it might

9  play into that, if that argument is made at some point as we go

10  along -- did we just lose somebody, Don?  My picture just

11  changed up a bit.  Okay.  All right.  Go ahead.  Mr. Graves.

12  *MR. GRAVES:*  Your Honor, I would submit that if --

13  just to start with the masseuse example that the Court raised

14  --

15  *THE COURT:*  And I pulled that straight -- I think,

16  pretty much straight -- I may have phrased it slightly

17  differently, but that was the example, I think, was straight

18  out of one of pleadings that defense filed.

19  *MR. GRAVES:*  So I think some additional facts or

20  context might be necessary.  I think, ultimately, if the person

21  commits the act with the mens rea that is prescribed by the

22  statute, then they violated the statute and could be found

23  guilty, and so if the masseuse was touching somebody's buttocks

24  for massage, and at the same time they were intending to

25  gratify their own sexual desires, then they would be guilty of

1    the offense.  Now the problem, of course, would be the

2    government would have to prove that beyond a reasonable doubt.

3    So what would proof look like in that situation?  You know, if

4    that same masseuse wrote that in a journal saying, *I did want*

5    *to help this person, but at the same time, I intended to become*

6    *sexually aroused by this* or *I was touching this person, because*

7    *it gets me off*, to be vulgar about it, then they were

8    committing an act that they didn't have permission for, because

9    the act that the person giving the massage gave permission for,

10   was physical touching with the intent for a massage, and at the

11   same time, there was physical touching going on with a

12   different intent, that now would violate the statute, and I

13   think that that flows to the Court's point about a sincerely

14   held religious belief.

15          Whatever Mr. Wall's -- again, I don't think this has

16   really been raised, and I guess we will see if it is, but if

17   Mr. Wall truly believed that sexual contact; meaning, he was

18   touching somebody with the intent to arouse himself or arouse

19   them, if that's his sincerely held religious belief, that's

20   fine, but what that doesn't avoid is the necessity that the

21   victim give permission for that; that the victim give

22   permission for the physical touching with that intent, and if

23   that is not present, then that is a violation of the law.

24          Did that answer the Court's question?

25          *THE COURT:*  Yep, I think it did.  Thank you.

1          *MR. GRAVES:*  That's all I have, Your Honor, unless

2     there's anything specific that the Court would like to ask?

3          *THE COURT:*  No other questions, at this point.  Let me

4     turn back, as I indicated I would, Ms. Senia, to you.

5          *MS. SENIA:*  So, the government's textual reading can't

6     be right and we know that for a few reasons.  The first is the

7     interpretive doctrine in pari materia, and that goes back to

8     the Uniform Code of Military Justice, that statute by Congress,

9     regulating the same area using the same language, and in that

10    statute, Congress defines sexual contact and sexual act in the

11    same way, with this, you know, intent to abuse humiliate,

12    harass, arouse, and notwithstanding that, Congress still

13    enacted different provisions to cover this area about

14    fraudulent misrepresentations; that the act serves  a

15    professional purpose.  So what that tells us is that Congress

16    did not believe that just the definition of sexual act or

17    sexual contact inherently would make this type of thing a

18    crime.  And the government's admission here, or agreement, that

19    the examples in the defense brief would be federal sex crimes,

20    is telling, because they say that if you have this dual intent

21    then all of a sudden it becomes a crime, and that's quite

22    troubling that -- it ignores, I think, to some extent, human

23    nature, that if somebody is doing something for a proper intent

24    but at the same time they are human and they have certain

25    desires, but they are sticking to the physical act that was

1  allowed, then all of a sudden that becomes a crime.  I think

2  that's really problematic.  And you know, the government

3  doesn't mention the other example, which is, you know,

4  teammates slapping each other on the buttocks, that's, you

5  know, another example where totally innocent conduct, that

6  happens all the time, suddenly turns, not just on the

7  defendant's intent, and the government here is doing some

8  conflating of crimes that turn on the defendant's intent, which

9  of course is -- that is the basis and foundation of criminal

10  law, but what they're asking for here is different, which is

11  the first time that I think I would -- I have ever seen or been

12  aware of, of interpreting a statute, not just to require a

13  specific intent by the defendant, but requiring the alleged

14  victim to be aware of the defendant's specific intent or

15  motivations.

16       I'm not aware of any statute that operates in that

17  direction, that the defendant often needs to know about the

18  alleged victim's mental state, but I have never seen it done

19  the other way around, and that would be incredibly unusual.

20       And then finally, just to talk about the specific

21  instruction.  The government's theory is --

22       *THE COURT:*  Let me stop you, Ms. Senia, because I'm

23  puzzled by that.  You know, if I follow the government's logic,

24  the defendant knows, at the time that the victim says yes, that

25  the victim can't be giving permission for medical treatment,

1  because it's not for medical treatment.  It is for sexual

2  gratification.

3         So, how are we adding in that extra step?  I mean,

4  we -- it all is what is in the mind of the defendant.  He knows

5  that there's no valid medical treatment in him placing his

6  finger in the victim's vagina, and that when she says yes to

7  that, she can't be giving permission for valid medical

8  treatment, because it isn't for valid medical treatment, I

9  guess unless somebody can convince a jury that there's valid

10 medical treatment to that.  Why are we adding that extra step

11 into that?  How does that flow from that?

12        *MS. SENIA:*  The adding of the extra step is the

13 government's doing.  This is their textual argument that

14 because the statute requires permission to sexual contact, that

15 is a state of mind of the alleged victim.  They have agreed to

16 give permission, and then because sexual contact defines it is

17 as an intent of the defendant, then what the government is

18 doing it putting those things together and requiring an

19 awareness by the alleged victim about the defendant's intent.

20 So, that's where it's unusual in criminal law.  We are asking,

21 not just about what the defendant intended, but what the

22 alleged victim thought he intended, and whether they knew that

23 he intended that.

24        *THE COURT:*  Why is that really what we're asking,

25 when -- keeping in mind, of course, that none of this is proven

1    yet, these are allegations, but we have to talk about about the

2    facts as, at least, we think they might be. If the facts, as

3    the government thinks they might be, is that Mr. Wall said, *I*

4    *am a healer, and I need to do this to heal you*. What the jury

5    has to decide, really isn't what the victim believed or didn't

6    believe. What the victim has to decide is, was this really

7    done to heal somebody or not, or was it done for sexual

8    gratification?

9         *MS. SENIA:* Not quite, Your Honor. The jury has to

10    decide, did this person give permission? And so, if they have

11    given permission and they've said, *Yes, touch me down there*,

12    then that element the government can't satisfy. The way that

13    they are trying to muddy the waters is saying, *Well, no, no, no*

14    *it's not just to the physical act it's also to the defendant's*

15    *mental state*. *Not just that you touching me down but that you*

16    *are touching me down there, for a sexually intended purpose.*

17         *THE COURT:* And why can't the jury consider that?

18    When the defendant says, again, keeping in mind that none of

19    this is proven, *that I am touching you down there, to heal you*.

20    *I am not touching you down there for sexual gratification*. Why

21    is that not something that the jury can consider?

22         *MS. SENIA:* It's not that the jury can't consider it,

23    it's that in deciding whether the government has satisfied the

24    *without permission* element, that maps on to it. So, if the

25    government is right, then you know then we have this in pari

1  materia problem.  We have it sweeping in a whole bunch of

2  innocent conduct.  You have -- basically, the government is

3  saying someone can give permission for the exact same thing.

4  Someone has a camera, watching what's happening, someone says

5  *Yes, you can do this*, please my -- *I pulled my upper hamstring*

6  *please massage that*, that is -- can be exactly the same,

7  physically, that's what we see.  But what makes it a crime, is

8  not whether the alleged victim says, *Yes, please massage me*

9  *there,* but, *Yes, please massage me there, and I am agreeing to*

10 *everything that's going on in your head at the time*, and that's

11 what makes it really unusual for criminal law.  I can't think

12 of any other statute that works in that way, where it's

13 requiring externally everything remains consonance.  The one

14 thing that changes is the alleged victims' awareness of what's

15 going on in the defendant's head.

16      I don't know if that answered -- did that answer

17 Your Honor's question?

18      *THE COURT:*  It did.  I'm not sure I agree or not, but

19 it did answer the question.  Go ahead.

20      *MS. SENIA:*  Well, I think that if we -- even if

21 Your Honor agrees, then if we look at the proposed instructions

22 by the parties, that's not inconsistent with Mr. Wall's

23 instruction.  The government can argue that, if they want, if

24 Your Honor permits it.  We would object, obviously.  But if

25 Your Honor permits it, that's not at all inconsistent with our

1    instruction.  They can argue that, and Your Honor can give our

2    instruction.  It's not consistent with the government's

3    instruction, because that's not what the government's

4    instruction says.  It says, *The fundamental nature of his*

5    *conduct*, which I still don't know what that means.  The

6    government says that it's, you know, the fundamental nature of

7    what they're doing, but where do we draw the line?

8         So, you know, you have somebody's subordinate at work,

9    who goes to their boss and says, *I want a promotion, I will*

10   *give you sex for the promotion*.  The boss says, *Okay great*.

11   The subordinate thinks that the fundamental nature of that act

12   is a quid pro quo that will advance his career, but if the boss

13   doesn't actually have any intent of promoting the person, then

14   that fundamental act is different, that's just sexual

15   gratification, and that's where we need more precise terms to

16   allow the jury to do their job, and so even if Your Honor, at

17   the end of the day, disagrees with the defense's

18   interpretation, that we should still be able to get our

19   instruction, and then the Court, I think, would have to

20   order -- couldn't allow the government's instruction about the

21   fundamental nature, because that's not the same thing that

22   they're asking for.

23        I think, also, you know, the government says that you

24   have to know it's a sex act, based on the case out of

25   California, and that's belied by the *Bolsinger* case.  The

1  *Bolsinger* case, which cites the exact same treatise that the

2  government here has relied upon, talks about this issue,

3  specifically, in the context of doctors, and says it comes down

4  to the physical act.  If the person agreed to the physical act,

5  then that's what we look at.  Was there consent to that

6  physical act?

7          In *Bolsinger*, again, it was a camp counselor, who they

8  agreed for their testicles to be touched by the defendant, and

9  that physical act was the same.  Whether there was some

10  potential medical purpose that was told to them fraudulently,

11  that makes it fraud in the inducement.  It's not fraud in the

12  factum.  And the reason that the physical act is the line, is

13  because it's easy to draw for courts.  It's easy for everybody

14  to understand.  We don't have to make guesses about not only

15  what's going on in the defendant's head, but what's going on in

16  the victim's head, about what's going on in the defendant's

17  head, and we don't have to worry about whether something is

18  material to specific people or specific persons.  We have a

19  bright-line rule that's easy to apply, it's easy for due

20  process reasons, and it allows everyone to be on the same page.

21          I think the last point that I want to hit is that I

22  was a bit surprised, I suppose, by the government's argument

23  that they aren't trying to apply the common law given -- I

24  thought that -- their argument was that this is fraud in the

25  factum, and that's why their instruction is permissible, and

1    that's why this falls within the scope of the statute.  I think

2    if the government -- that's not the government's position, then

3    certainly the defense's position would be, you know, Congress

4    is legislating in the backdrop of the common law.  They talk

5    about the common law in the legislative history.  They talk

6    about what aspects of the common law they specifically want to

7    change, and so, you know, the Supreme Court has said, when

8    Congress is legislating -- the phrase is something like *old*

9    *soil* -- they have to, you know -- you have to construe and

10   interpret a statute with that in mind, with this *old soil* that

11   Congress is working from.  And so, because of that, all of the

12   authorities agree that there's this physical act distinction.

13   It's the government that tries to limit it and change what the

14   common law has said, and legislatures can certainly do that,

15   but that's not what Congress did here.  And so, really, the

16   question is, was there consent to the physical act?  If not,

17   then there was no permission, and that's just -- there's, you

18   know, there's no need for any other, I suppose, instruction by

19   the government if that's their theory.  They can just argue

20   that; that that's one physical act, happened, that was

21   different than the physical act that they allowed.

22          If the argument, instead, is there was consent and

23   permission given, but we're legally not going to treat that

24   content as valid, which is what their instruction says, that is

25   textbook fraud in the inducement, when you are taking consent

1  that actually happened, that actually occurred, that was

2  actually given, and you are saying it was vitiated or

3  invalidated for some reason, that's fraud in the inducement,

4  and so, really the government is trying to make this case seem

5  like fraud in the inducement -- or fraud in the fact, but what

6  they're actually doing, based on the doctrine and what it

7  means, is applying a fraud in the inducement rule.

8        *THE COURT:*  Well, doesn't that -- I guess -- and I

9  will come back to Mr. Graves on this.  It seems like there are

10  several different ways of looking at this.  One is, *I give*

11  *permission to insert a finger into a vagina*, for any purpose.

12  It doesn't matter what that purpose; is the second is, *I give*

13  *permission to be healed*; and the third is, *I give permission*

14  *for sexual gratification, because tomorrow you are going to ask*

15  *me to marry you*, and you don't tomorrow, you, instead, break up

16  and say, *Ha-ha,* you know, *fooled you*.  Aren't those three

17  really distinct circumstances?

18        *MS. SENIA:*  I suppose it depends what you mean by

19  really distinct circumstances.  I think whether -- which camp

20  they fall under is -- it highlights why the rule is a physical

21  act.

22        So I think if we -- if we look at the treatise, and

23  this is cited in the *Bolsinger* case, the treatise that the

24  government has relied on, you know, it talks about this

25  physical distinction because it's easy to apply.  You know, if

1   somebody thinks that they are having sexual intercourse for

2   some fraudulent pretense, because it's necessary, that's fraud

3   in the inducement.  That's -- you know it's -- the cases don't

4   turn on what the alleged victim believed about the defendant's

5   mental state, that's, you know, in the *Bolsinger* case.  It was

6   also supposed to be for a medical purpose, but the Court just

7   draws this bright-line rule, based on this treatise, based on

8   the common law, which is, was there consent to the physical act

9   or not?

10       And so, to Your Honor's question, the first -- I'm

11  trying to remember the specific bucket.  The first bucket is

12  this, you know, you say you are going to insert a speculum and

13  you insert a penis.  I think everybody agrees that's fraud in

14  the fact, and there's no consent to that.  And then you have

15  other misrepresentations, *I love you, let's make love*, I think

16  under the government's interpretation about this being the

17  fundamental nature, and this being a material fact, the

18  government seems to think that that would vitiate consent.

19       THE COURT:  Okay.  Do they really, though?  I mean,

20  that's not what I hear them saying.  Okay.  They can, of

21  course, defend themselves.  But the way that it seems like they

22  are hairsplitting is in the *I love you*, but you really don't,

23  it's just an inducement, you know that to be -- you know, I

24  hate to be pejorative, but the teenage boy that says that to a

25  girlfriend and he really doesn't love her, they all still

1 understand that sex is what is occurring, that seems to be the

2 issue there.  So, is that really the same?

3     *MS. SENIA:*  It's the same in the sense that -- so, I

4 guess is Your Honor's question -- I mean, the government hasn't

5 proposed a formulation of this that's easy to parse.

6 Fundamental nature is so vague that it does fall -- that those

7 sort of articulations of *I love you but really I don't*, do fall

8 within the fundamental nature, depending who you are talking

9 to.  But if you are asking, specifically, about sexual

10 gratification, I suppose, and whether somebody --

11     *THE COURT:*  Sexual gratification is clearly an element

12 of the crime, and under any understanding of the, *I love you;*

13 *I'm going to marry you; I'm going to give you a ring; I'm going*

14 *to give you a promotion*, under any of those, there's still an

15 understanding that sexual gratification is part of the

16 analysis.  Maybe the sexual gratification, you know, maybe

17 there's a lie, in terms of getting it to happen, but everybody

18 understands that somebody is going to be sexually gratified out

19 of this act, which seems fundamentally different from an act

20 that may still physically have something to do with the

21 genital, but purportedly has nothing to do with sexual

22 gratification.

23     *MS. SENIA:*  Well, I think that's inherent in the cases

24 involving intercourse, right?  The case out of California, it's

25 not a medical device that's being inserted.  They are having

1  sexual intercourse, which necessarily requires somebody to be

2  sexually aroused.

3      *THE COURT:*  Okay.  Let's take that out of it.  I have

4  never been to a gynecologist, but I have had a prostate exam,

5  males get those, that involves a finger, not a device.  I

6  suppose maybe it does in some circumstances, but that might be

7  the best example.  The idea of a prostate exam that -- or a

8  rectal insertion that has absolutely no medical purpose, versus

9  a rectal insertion that is for sexual gratification, taking --

10  setting completely aside the idea of intercourse.

11      *MS. SENIA:*  So, in those situations, we can look to

12  how other jurisdictions, or even Congress itself, have dealt

13  with that scenario.  And Congress, itself, enacts a specific

14  statute to outlaw that specific conduct, and if they thought it

15  was already covered, in either the definition of the nature of

16  the sexual act or sexual contact, or the definition of consent,

17  then they would have had no reason to do that.  So, that tells

18  us -- and it's not just Congress that's done that.  As the

19  government, itself, points out, there have been numerous states

20  that have modernized their statutes, specifically to proscribe

21  this type of conduct, and that's so that there's no question

22  about where the line is.

23      We could think, as a society, that we're going to

24  allow somebody to pretend that they love someone, even if we

25  think lovemaking is a fundamentally different act than one for

1    sexual gratification purely, but we might think, as a society,

2    *Well, we don't want people to lie and pretend they are doctors*,

3    and that would be reasonable. I think we would all agree about

4    that. But the question still comes back to whether this

5    statute prohibits that, and under the traditional doctrine, it

6    does not, and we know that from, again, if you look at the

7    *Bolsinger* case. The Court talked specifically from this

8    treatise about what is inducement and what is in the fact, when

9    you are talking about a doctor case, and it says,

10   specifically -- I have so many papers here. I apologize,

11   Your Honor. Usually I have a whole binder for these things

12   that I can just easily flip through. But what the Court says

13   is that if it goes to the reason for the contact, that is fraud

14   in the inducement, and that's exactly what we have here.

15          I just had it. I don't know where it went. It's

16   probably ... here we go. Yes. So, if you look at the

17   *Bolsinger* case, and the specific words that are cited by that

18   Court, in citing the treatise, that both parties have relied

19   on, it says, *In some of these cases, the doctor has not*

20   *hesitated to make clear that he intended to have sexual*

21   *intercourse, his fraud being the deceitful suggestion that this*

22   *is necessary to cure some malady*, but because the person knew

23   exactly was to be done, and was deceived only in regard to a

24   collateral matter, the reason why it was to be done, then that

25   is what we're talking about sex in the -- sorry, fraud in the

1  inducement.  And so, the line is not really, *Are you getting*

2  *sexual pleasure from this*, which is inherent in sexual

3  intercourse, I think, necessarily, but if the lie is about the

4  reason that this has to happen, we're talking about fraud in

5  the inducement.

6          And if the Court agrees with the government's

7  interpretation, that still should allow us to give our

8  instruction.  There's nothing that the government has pointed

9  out specifically that's wrong with the instruction, and what it

10 says is the exact same as fraud in the inducement, which is

11 whether the person -- if they gave permission for the contact

12 that occurred, the sexual contact that occurred, then that's

13 the question.  Not whether the person's agreement was induced

14 by misrepresentations or trickery.

15         So, Your Honor could agree with the government and

16 that would still not be a reason to deny the instruction that

17 the defense has requested.

18         THE COURT:  All right.  Thank you, very much,

19 Mr. Graves, again, I indicated, I asked Ms. Senia some question

20 I didn't ask you.  If you would like to, very briefly, respond?

21         MR. GRAVES:  I will keep it brief, Your Honor.  I

22 guess just a couple of points.  First of all, there's been a

23 reliance on both set of arguments on this Uniform Act of

24 Military Justice.  I would point out that law was updated in

25 1996, and just because Congress, or any statute, makes a law

1    better and more clear and better to understand, doesn't mean

2    that that conduct was not criminal under a prior law; that

3    cannot be the case.  This fact pattern was charged in a variety

4    of different jurisdictions, dating back, if the Court really

5    explores the issue, to England, where that it's discussed far

6    before any of those updates and it's still, in fact, a crime.

7         The discussion about the scope of the permission, and

8    how somehow that makes this unusual.  It is unusual in this

9    sense, in that, most criminal statutes don't rely on the

10   victim's permission.  Again the permission's scope is governed

11   by what the permission is given to.  That is the fact that --

12   the item the permission is given for, limits the permissible

13   conduct, and that here, there's no ambiguity here in the

14   statute, it is to sexual contact.  Permission must be given to

15   sexual contact and not for for anything else.

16        Again the boss example, the phrasing fundamental

17   nature or material fact, the Court can phrase it, you know, in

18   a more clear way, I have no doubt, than our attempts to draft

19   it, but what we're getting at here is, with the boss scenario,

20   *Sleep with me I will give you a promotion*, everyone knows that

21   it's sex, right?  So the fundamental nature of that is sex.

22   In, you know, the medical situation, *Come over here I will give*

23   *you a gynecological exam*, the victim believes it's a

24   gynecological exam, in fact, it is a sex act.  Fundamental

25   nature of the act is different.

1        So I think there's, I think the language that we

2   adopted was taken, in part, from their restatement of contracts

3   law, which is a somewhat unusual source, but the bottom line is

4   that the jury should be instructed that if the fraud goes to

5   the heart of what is occurring, then even nominal permission

6   for the healing to take place, does not make that valid

7   permission under the way the statute reads.

8        I would point out a couple of things with *Bolsinger*.

9   First of all, it's a separate statutory scheme.  It's described

10  in the case.  *Bolsinger* got it wrong, from our perspective.

11  There's countervailing authority from other state courts that

12  make, in my opinion, a better reasoned analysis of what

13  occurred, and ultimately I don't think the Court needs to

14  venture into state law, doesn't need to venture into this

15  complicated common law doctrine.  Simply needs to look at the

16  words of the statute, what it prohibits and instruct the jury

17  accordingly.

18       *THE COURT:*  All right.  Thank you very much.  I know

19  that there are -- and I am going to turn back to Ms. Senia in a

20  moment.  I know this, there are disputes in large part by the

21  defense, but potentially both ways as to what I would consider

22  no less important, but perhaps more frequently given

23  instructions, credibility, burden of proof, things of that

24  nature.  I intend, in large part, to address those at a later

25  point in time, because I don't think that they get to,

1    essentially, the fundamental nature of what we're disputing in

2    this case, and don't really inform what needs to happen in

3    advance.  So, I want to limit this conference today,

4    particularly given the passage of time, mostly to those things,

5    because we have some scheduling issues to discuss at the end.

6            Ms. Senia, other essential elemental-type instructions

7    that you think we need to discuss, if any?  Or have we covered

8    the field on that?

9            MS. SENIA:  I ... Ms. Suelau, I don't know if

10   there's --

11           MS. SUELAU:  Your Honor, I want to be clear on what

12   you mean by elemental, in terms of... what you mean by

13   elemental.  In terms of by -- I guess we -- the primary dispute

14   I would bring up that might be relevant here is as to

15   Your Honor's preliminary instruction -- preliminary proposed

16   instructions, and in terms of the elements there, it would be

17   whether to give the five element instruction that I believe, at

18   this point, the government and we agree should be offered as to

19   both 2244 and 2242.

20           THE COURT:  Yeah.  I think elemental was probably not

21   a good word choice, given the elements of the crime.  What I'm

22   talking about is more of, kind of, the standard stock

23   instructions that are frequently given in many cases.  At least

24   one of the defense pleadings, recently, and maybe two, if I'm

25   recalling, address defense's proposed changes to that.  I will

1    absolutely consider and evaluate those, but I don't think we

2    need further argument on them, at this time.

3         As to the elements of the offenses, as they are

4    expressed both in the preliminary jury instructions and in the

5    final instructions, it appeared to me, yeah, that there was

6    some substantial agreement on that.  We just haven't had, on my

7    side of things, had the time to go back and recraft those, but

8    I intend to.

9         Anything further, Ms. Senia or Mr. Graves or

10   Mr. Player, that you think we need to put on the record about

11   those issues, or see Ms. Suelau?  I wasn't trying to pick who

12   should say what.

13        *MS. SUELAU:*  I think if we're talking about sort of

14   legal definitions, I think the two things I see outstanding are

15   the definition of knowingly, or -- and whether or not to

16   include knowingly in the instructions, and whether or not a

17   deliberate ignorance instruction is appropriate, which I think

18   the definition of deliberate -- whether or not a deliberate

19   ignorance instruction is appropriate might be somewhat informed

20   by Your Honor's ruling today.  So, I will defer to Your Honor

21   on that.

22        I mean, I guess it's my view that a deliberate

23   ignorance instruction is a complete non sequitur to this case,

24   but -- so I guess, does Your Honor want argument on those?

25        *THE COURT:*  Yeah.  I really don't think I do today.

1    In terms of the jury instructions, I'm not going to rule from

2    the bench on these issues today, and I may well issue a written

3    order or address it by way of a script that I draft at a later

4    point in time, but I think that these issues are too important

5    and too fundamental to this case for me to rule right now.

6    They deserve more treatment and research, and I intend to give

7    them that.

8          So, I'm not going to address the really significant

9    outstanding issues, regarding the jury instructions today.  In

10   terms of a deliberate ignorance instruction, I don't -- I'm

11   certainly open to argument, if the parties think that I need to

12   consider this.  I don't know that I was considering putting

13   such an instruction in the preliminary instructions.  I think

14   that's probably getting deeper into the weeds than I think

15   really needs to be gotten in what is -- what I consider more of

16   a fairly short roadmap for the jury of what they need to do and

17   think about going into the trial.

18         Not that it's unimportant.  It is important.  But I

19   also keep in mind, it is what it is, and it's not something

20   that they have in writing, it's not something that they are

21   charged with, that the charging conference impacts, so again,

22   I'm open to argument on that if somebody is asking me to give a

23   deliberate ignorance instruction, and I know that may depend on

24   what I determine with other instructions, so maybe the parties

25   want to think about that and address that at a later point in

1   time.

2          In terms of knowing, you know, in some circumstances I

3   do give a little bit more of, kind of, definitional

4   instructions during the course of preliminary instructions.  I

5   think we delved slightly in my last criminal trial to some

6   self-defense concepts, but not particularly deeply.  I think

7   there were a couple of sentences there.  So, having some

8   definition of knowing might be important, and I am, I think,

9   probably more open to that than the idea of a deliberate

10  ignorance instruction, because that's going to be somewhat the

11  heart of this case.

12         So, are you -- are you thinking, Ms. Suelau, that you

13  want to ask for some knowing definitions in the preliminary

14  instructions?

15         *MS. SUELAU:*  No, Your Honor.  So, in regards to the --

16  first of all, I think interjected before Ms. Senia had an

17  opportunity to say something that she wanted to say on what we

18  were speaking about.  And then, in regards to the preliminary

19  instructions, if Your Honor wanted to go through those, we are

20  prepared to do that.

21         *THE COURT:*  Yeah.  I don't know that I need to go

22  through them more right now, but if you have some points you

23  want to make on them now, let's quickly do that.  Go ahead.

24         *MS. SUELAU:*  Okay.  There are -- our first point,

25  Your Honor, is that we would be asking for Your Honor to

1    include the statement that Mr. Wall begins the trial with a

2    clean slate.  Essentially, that it's an easy-to-understand term

3    for jurors who are, as Your Honor is aware, going to be

4    inundated with information, including the nature of the charges

5    and the charges themselves.  So, presumption of innocence, you

6    know, must be found guilty beyond a reasonable doubt, are all

7    things that Your Honor is also going to define in the jury

8    instructions, but to the extent that a juror is inclined, you

9    know, after voir dire, after these preliminary instructions to

10   think, *Okay, there's something here, because we're here in*

11   *trial*.  I think it's very important to say, in plain language,

12   something that jurors can understand, *Mr. Wall begins this*

13   *trial with a clean slate*.

14          So, I'm sorry ...

15          *THE COURT:*  Go ahead.

16          *MS. SUELAU:*  I thought, perhaps, Your Honor was asking

17   a question.  Did Your Honor want to go one-by-one, and allow

18   the government to respond in the interim or?

19          *THE COURT:*  No, just go ahead.  I think these are

20   discrete and short enough that it's probably better to have a

21   full response at one time.

22          *MS. SUELAU:*  Okay.  The next would be in regards to

23   the elements that I stated.  I outlined that position.  I think

24   because the government agrees, unless Your Honor is, I guess,

25   disinclined to agree with the parties, I will save my breath.

1 So we're asking --

2     *THE COURT:* Yeah. I'm probably inclined to agree. If

3 I'm not, then I will give the parties an opportunity to address

4 it at a later time.

5     *MS. SUELAU:* Okay. And the one thing that is

6 different between the elemental instructions and the

7 preliminary, and that we're asking for in the final, is that a

8 definition of Indian be included. So, we're not asking for

9 that in the preliminary, but to be clear, we do think that's

10 appropriate in the final instructions.

11     The next objection is the same as to both counts --

12 both statutes should have five counts. And then one thing we

13 think is particularly important is including the definition --

14 is discluding the definition of sexual act and sexual conduct,

15 in this case.

16     First of all, I don't believe that, you know, there

17 will be much dispute or the argument hinges on whether or not

18 the physical act of this was a sexual act or sexual contact,

19 when we're talking about what the physical act was or wasn't.

20 So, it's not necessary for the jurors to have at top of mind at

21 the beginning of trial, these lengthy definitions that include

22 some seriously inflammatory language, some of which is -- you

23 know, the language that is relevant is likely not in dispute,

24 but there's also included in there some nonrelevant language,

25 and hearing that upfront, when it's not necessary, as

1    Your Honor said, you know, the juror won't have these

2    instructions, but as I said earlier, the jury is hearing all of

3    these terms that they are not used to hearing.  Some of the

4    terms they will know and be well familiar with will be terms

5    like anus and vagina, and so if we're front-loading them with

6    all of this legal terminology, and really only term we're

7    giving them that they are well familiar with are these sexual

8    act and sexual contact definitions.  Putting that at the

9    forefront of jurors' minds, so even though we are saying you

10   begin with a clean slate, we are telling them these are the

11   kinds of aggravating things you could hear, when there's really

12   no benefit.  Let's just wait until they hear them, and then at

13   the end they will be instructed, *Based on what you have heard,*

14   *here's what constitutes sexual act, based on what you heard*

15   *here's what constitutes sexual conduct*, so they can match what

16   they have heard to the definition, when it's not -- so in that

17   way it's not necessary to front-load it in what's potentially

18   prejudicial language and not relevant.

19          And then finally, we submit that the beyond a

20   reasonable doubt definition we have proposed is the appropriate

21   definition.  The biggest issue, Your Honor, being this term

22   *firmly convinced*, and I understand it's in the Tenth Circuit

23   pattern instruction, but when I hear *firmly convinced*, it's far

24   more akin in my common understanding to clear and convincing

25   evidence.

1          When other definitions of what that level of

2     convincing needs to be, when we're talking about beyond a

3     reasonable doubt, are far more serious.  When I say, this is

4     more convinced than you would need to be to remove someone's

5     child, that sounds way more than firmly convinced.  But -- so I

6     think firmly convinced contains this minimizing language;

7     whereas, the language we proposed, which is proof that is so

8     convincing that you would not hesitate to rely and act on

9     making it, in making -- act on it, in making the most important

10    decisions in your own lives, is much more reflective of beyond

11    a reasonable doubt.

12          Firmly convinced, lacks this kind of specificity and

13    definition that the Sixth Circuit pattern has and minimizes the

14    burden of proof.  So, that's why we submit -- go ahead.

15          *THE COURT:*  I thought you were done.  I was saying,

16    thank you, Ms. Suelau, but I may have tripped over you not

17    quite being done.

18          *MS. SUELAU:*  Um, and then the last suggestions I have

19    that are filed at **Document 190**, are just as to, sort of,

20    expanding the admonitions to jurors.  I think in a world in

21    which news, going to be like here is everything that we could

22    mean by news, and giving some more examples, including Reddit,

23    Tik Tok, and things like that are also important, and also the

24    admonition in terms of bringing in -- jurors bringing in their

25    own information that they might have preexisting about these

1  issues is also equally important.

2      For example, I had a trial, several years ago, in

3  front of Judge Moore, in which a juror brought in her

4  independent knowledge of firearms, and said, *My husband has*

5  *told me X*, and I think it's important to include an admonition,

6  and that resulted in that juror being dismissed, and

7  Judge Moore having to voir dire all of the other jurors to

8  ensure that they were not infected by that information.  In our

9  view it should have resulted in a mistrial, but that's an issue

10  for someone else to decide.  But if we include language that

11  says, *Not only are you not seeking outside sources, also don't,*

12  *yourself, be that outside source and come in here and inform*

13  *the jury of what you may or may not know, based on this case or*

14  *based on issues that are relevant to this case*.  So, I think

15  that's an important admonition to add.

16      *THE COURT:*  So, on that last point, Ms. Suelau, how do

17  we ... people come in with the experiences that they have in

18  life, and they are allowed to consider the case, in light of

19  those experiences, that's one of the reasons we require juries

20  to be 18 -- or at least 18 years old, if not older.  Why -- or

21  how do we separate those out from, essentially, the way I'm

22  hearing your argument, which is, people might have some sort of

23  expertise?  For example, sometimes we get on jury venires an

24  attorney, and often they are struck, but sometimes they are

25  not, and frequently the questioning of that attorney is along

1    the lines of, *If you have a belief about the law that differs*

2    *from the judge's belief, and the judge gives you some*

3    *instruction, you know, will you say, you know, I think that the*

4    *judge is wrong, or will you follow the judge's version of the*

5    *law, whether you agree with it or not?*  I suppose that same

6    example could come along with a person who has firearms

7    expertise or expertise as a daycare provider.  You know, a

8    myriad of different options.  People aren't necessarily

9    precluded from considering cases in light of what they already

10   know.  Isn't some of that an issue that you need to, and as

11   well as the government, properly voir dire jurors to determine

12   what they know in light of what you think might be at issue in

13   the trial, understanding that it's not perfect and there's a

14   limited amount of time.

15        Why would I legally give an instruction that seems to

16   countermand what jurors are, in fact, allowed to do?

17        *MS. SUELAU:*  I think the difference between the

18   example of what a lawyer may or may not know, and then being

19   instructed to follow the Court's instructions on the law, is

20   sharing that information -- other extrinsic information with

21   the other jurors.  And the example I gave is studying Native

22   American tribes, and you share that information with other

23   jurors.  You are not relying on your own common sense and

24   experience.  You are, instead, sharing those with jurors.  And

25   also, if you are using that information to override information

1    you learned in the trial.

2          So, perhaps different wording could be appropriate.

3    The wording I proposed is, *Do not share any information you*

4    *know or have learned that you think might be helpful if for*

5    *example you have studied Native American tribes in school or*

6    *for leisure do not rely on that information or share it with*

7    *your fellow jurors*.  Perhaps Your Honor's point might strike

8    the portion that says*, Don't rely on that information* and

9    instead say, *Don't rely on that information over what other*

10   *information you learn in this trial*, *and certainly don't share*

11   *that with other jurors*, that's where the issue most commonly

12   comes up is the sharing of this with other jurors.  Instead of

13   just saying, *It's my opinion, about this*, but not saying, *Well,*

14   *I have actually done a lot of reading on these tribes, and so I*

15   *know this thing*, *and it's not something we learned here in*

16   *trial, but it's something that you should consider in your*

17   *deliberations*.  That's a different issue than reliance on

18   common sense.

19             THE COURT:  Okay.  Mr. Graves?

20             MS. SUELAU:  And sorry, the last thing is the

21   inclusion of the word *admitted exhibits* on page nine, to -- so

22   that the jury understands that perhaps there may be exhibits

23   that are not admitted.

24             THE COURT:  All right.  All right.  Mr. Player or

25   Mr. Graves?

1          *MR. PLAYER:*  I will be responding, Your Honor.  With

2     regard to the request that Mr. Wall -- the Court explained that

3     Mr. Wall starts with a clean slate.  We're not opposed to the

4     Court reminding the jury that he is innocent until proven

5     guilty, at the appropriate times.  I'm not sure everybody has

6     the same understanding of what, *Starts with a clean slate* is.

7     I just think it's better to keep with the language that the --

8     that we're dealing with here and the standards and the burden

9     as described in the law.

10          I'm -- in the proposed five elements instructions, in

11    the first line, it includes the, *It or caused the sexual act*,

12    but I believe the Indictment only includes the *engaged in*

13    language.  So that could, potentially, be confusing for the

14    jury and that could come out.  I'm not sure that every element

15    instruction needs the unanimous reminder.  At some point, when

16    that is reminded to them repeatedly, they might start to feel

17    some sort of pressure to focus on the unanimity prong and

18    almost wondering if they're being directed that that's

19    difficult to find and that they need to give that some sort of

20    of a heightened unanimity.

21          With regard to the sexual act or sexual contact, we

22    think that those definitions that are applicable, not all the

23    entirety of the sexual contact acts or sexual acts, acts, need

24    to be provided upfront, but I think it is appropriate but those

25    phrases, it's going to be impossible to know what the jury

1  thinks those phrases include, and as they are listening to the

2  evidence, it would better to have them focused on what the

3  elements of those really are, so that they are listening for

4  particular applicable definitions and not whatever definition,

5  in their own mind, they think is included within those phrases.

6  The *firmly convinced* language that is part of the

7  beyond a reasonable doubt is the law in the Tenth Circuit, and

8  it provides another way to understand the standards, and we

9  think that is the appropriate definition and we think that

10 should be included.

11 With regard to the admonishments, I think some of --

12 THE COURT:  And let me stop you on the admonishments.

13 When you are talking about admonishments, as it relates to what

14 the jury should and shouldn't do, I think Mr. Graves and

15 Mr. Player may have heard the language that I frequently read,

16 we will put that out, but I have a longer definition or

17 instruction that is significantly more in line with what I

18 think Ms. Suelau is asking for.

19 The reason it's not in the preliminary instructions is

20 that's actually not when I usually read it.  I usually read my

21 longer instruction right before the first bathroom break in the

22 morning, when we have got a bazillion jurors running around in

23 the hallway with everybody else, which can include -- well, it

24 won't here, but sometimes includes the defendant, often

25 includes the attorneys.  So, I give that long instruction

1  there, but it's not in the preliminary instructions, but we

2  will put it out, because I guess if the parties have some

3  objection to it they can tell me.

4       The reason I read it there, rather than in the

5  preliminary instructions, is because of exactly what I just

6  said.  There's a bathroom break, people are out and about for

7  15 minutes, and at least in some trials we also have the lunch

8  break before I get to preliminary instructions, and the same

9  issues occur, particularly in a smaller town like Durango, but

10  it happens in Denver, where people are tripping over each

11  other, and I want them to do that, or maybe they have heard, by

12  that point in time, where the event might be, and I don't want

13  somebody to be driving to a location or getting on Google maps

14  over lunch before they've had their preliminary instruction and

15  doing exactly the things that we don't want them to do, which

16  is starting to research or otherwise finding things out.  So, I

17  have tried to cover all of the myriad of electronic sources

18  that is people might find.  New ones are always getting added,

19  but I think it says Instagram, Tik Tok and of those others.  If

20  there's some source that I don't know about, please let me

21  know.  The thing is kind of like a fungus and it keeps growing,

22  but that's for good reason.  So we will get that out.  But

23  yeah, I'm going to certainly -- to the extent that I think that

24  there needs to be a more extensive admonishment, that the

25  request by the defense is granted, but I already have that

1    admonishment.  I just don't encapsulate it in my preliminary

2    instruction.  All right.  Go ahead, Mr. Player.

3         *MR. PLAYER:*  Your Honor, with that, the government

4    rests.

5         *THE COURT:*  Okay.  All right.  Well, let me just

6    quickly run through some of these, in terms of the very simple

7    requests, which I think is entirely reasonable, that on a page

8    nine of the preliminary instruction, the sentence be modified,

9    *On the other hand any admitted exhibits will be available to*

10   *you during your deliberations*, that's granted.  I think that's

11   in line with the law.  They don't get to see excluded exhibits.

12        In terms of the longer admonishment, yes, I'm going to

13   do that, and will give that to the parties in advance so that

14   nobody is surprised about what I read.

15        With regard to the modifications or proposed

16   modifications to the Tenth Circuit pattern instructions, they

17   aren't the Holy Grail, but they are at least the most recent,

18   unless otherwise modified by case law, which is sometimes the

19   circumstance.  They are the most recent version of what the

20   Tenth Circuit in agreement or often in consultation with

21   numerous other stakeholders, which includes, judges, the

22   government, the defense bar, has put together as what should be

23   the instructions in this Circuit.  To that extent, I'm not

24   going to modify the instruction as to the suggested language of

25   *clean slate*, or change the *firmly convinced* language.  That

1    does not at all mean that there cannot and there frequently is

2    inquiry or analogy given with regard to those concepts.  For

3    example, exactly the analogy or concept discussed by the

4    defense, which is often -- this is phrased in the context of

5    taking away someone's child, and what that means in clear and

6    convincing, that example is frequently given during the course

7    of voir dire, and may well be given here.  The Court will not

8    limit that, as long as it comports with the law, but I'm not

9    going to change those instructions, either in the preliminary

10   instructions or in my final instruction.

11            With regard to the sexual definitions, I appreciate

12   the defense's argument, but at least in large part that request

13   is denied.  I think that this is one of those cases where the

14   jury would be at a massive deficit of understanding if they did

15   not have some definition of these different sexual contacts.  I

16   think that the argument overinflates the length of that.

17   Essentially, it's encapsulated in two different paragraphs on

18   pages four and five of the preliminary instructions, but I do

19   agree that to the extent that those instructions include

20   potential conduct that the parties know is not going to be

21   involved in this case, that that language needs to be stripped

22   out.

23            I will leave it to the parties in the first instance

24   to discuss that and propose to me modifications to that, as the

25   parties are more familiar with the extent of the alleged

1    conduct, perhaps, than I might be, at this point, but I don't

2    want to give definitions of conduct that aren't going to be

3    things that we know the jury isn't going to hear during the

4    course of trial, because I do think that that would be unfair

5    to the defense.

6         In terms of the *independent knowledge* language, I'm

7    also not going to make that modification.  I think that that

8    gets overly confusing.  Yes, does that, in some circumstances,

9    court a juror coming in and telling their fellow jurors

10   something that they know or some life experience that they

11   have, that could effect a jury verdict?  Yes, it possibly

12   could.  I don't believe that telling them that they can't

13   consider or discuss things in light of their independent

14   knowledge is appropriate.  The attempt to prophylactically keep

15   from having an independent expert on the jury is, in some part,

16   the function of jury selection and appropriate voir dire, and I

17   think it's appropriately encapsulated there, not in the

18   instructions.

19        I am, of course, open, that's not a final decision,

20   that's not something that is going into the preliminary

21   instructions anyway.  I will say that that order is without

22   prejudice.  I'm absolutely willing to consider that as we get a

23   little bit farther along, as it really is an interesting

24   concept, and it could be something that needs to be considered

25   further, but at least, at first blush, I'm denying that without

1    prejudice, and the ability to reraise that, as we go along, but

2    that is something that would be in our final instructions.  The

3    final decision doesn't have to be made on that, at this time.

4    And I think that addresses all of the preliminary instruction

5    issues, other than, we will modify the five factors or five

6    elements.  We will try keep them in line when we do so with the

7    charges as levied in the Indictment -- the Superseding

8    Indictment, at this point, and if some party thinks we've

9    missed the mark on that, just let us know and we will readdress

10   that moving along.

11        Mr. Graves or Mr. Player, other than dates for things

12   to happen, what else do we need to talk about today?

13        *MR. PLAYER:*  This is Mr. Player.  Nothing from my

14   perspective, Your Honor.

15        *THE COURT:*  Ms. Suelau, other than who else might

16   weigh in other than dates for specific actions, what else do we

17   need to weigh in on?

18        *MS. SUELAU:*  Your Honor, I don't think Your Honor

19   specifically addressed this, but I don't disagree with the

20   government that if they want to remove *or caused* from the

21   proposed five element definition, that's fine.  I have no

22   objection to that.  Sorry to bring this back --

23        *THE COURT:*  My addressing of that I think was in

24   saying that we're going to pull away.  We're going to look at

25   the Superseding Indictment.  Maybe I didn't say it exactly that

1    way, but that's my intent.  We're going to make sure those

2    elements match what's in the Superseding Indictment.  So, if

3    you think we've added other potential ways of committing the

4    crime that aren't the charged ways, which I think is really the

5    issue, let us know and we will pull it back out.

6         *MS. SUELAU:*  Okay.  The government made an argument on

7    our separated out jury instructions.  I will reserve that for

8    when we get to the final instructions, but I think -- someone

9    informed by Your Honor's decision on the 413 issue as well.  As

10   Your Honor said, you know, we expect each juror, I think you

11   used the term, up-and-down analysis on each count to each

12   victim, and if we are considering certain victims, where the

13   burden of proof is different, it's particularly important that

14   every single count have an elemental instruction and that each

15   elemental instruction begin with a reminder of, *As to this*

16   *victim as to this count here are the elements, and here is the*

17   *burden of proof as to that victim*.

18        So, you know, just in case -- I didn't want to be

19   construed as having waived anything on that, given that the

20   government brought that up.

21        In terms of what we have next, I would say, first we

22   would ask the government, once Your Honor makes a ruling on the

23   413, to file with the Court or submit to us their proposed

24   elemental -- you know, there's been some back and forth about

25   the elements of the offenses of the 413 act.  So, their

1   proposed elemental instructions, as it were, for the 413 acts,

2   as well as, you know, we would be ordered to do the same in

3   response, and include any additional, like, 413 jury

4   instructions, at that time.

5          So those are the --

6          *THE COURT:*  How long after my order are you asking to

7   file that?  It seems that could be simultaneous briefing.  I

8   mean, it's really not a motion and response.  It's, *Here's what*

9   *you think is appropriate under the law and here's what they*

10  *think is appropriate under the law.*  I don't know that we need

11  a response time.  You can each file within a specific period of

12  time.

13         *MS. SUELAU:*  Sure, Your Honor.  I would say three

14  business days.  So, if Your Honor's ruling is on Friday, that

15  would give us until Wednesday -- did I do that math right?

16  Yes.  So, I would say three business days.

17         I would also ask for the government's witness list and

18  exhibit lists, by the end of the week, and we will provide a

19  preliminary version of the same.

20         *THE COURT:*  Okay.  So, are you saying all parties will

21  have witness and exhibit lists out by close of business on May

22  9th?

23         *MS. SUELAU:*  Well, Your Honor, my consistent position

24  is that the -- you know, the defendant has no burden of proof,

25  and shouldn't have to disclose defense strategy, so that we

1   should not have to submit any witness and exhibit lists until
2   just before trial.

3   However, to the extent that Your Honor is requiring,
4   you know, that, you can let me know.  So, what we're
5   specifically asking for is the government to submit their
6   witness and exhibit lists Friday by, you know, by 5 o'clock, to
7   allow us to make use of it over the weekend, and set a deadline
8   for the parties to -- and I also think, Your Honor --

9   THE COURT:  Let me stop you.  Let me ask, Ms. Suelau,
10  do you have examples of courts in this district that have not
11  required the defense to submit witness and/or exhibit lists at
12  some point prior to trial?

13  MS. SUELAU:  Your Honor, I think that the default is
14  that all -- in my experience, courts will accept, from the
15  defense, more preliminary lists, in terms of our exhibit lists,
16  and our witness list is largely contingent on the government's,
17  and we would have to at least have some time after we get
18  theirs to review and respond and also determine whether or not
19  there's conferral on certain exhibits or conferral on certain
20  witnesses.  But I would say every court that I have practiced
21  in front of does require the list, but will accept a, what I
22  would call, a barebones submission, understanding that the
23  defense case is much more likely to be contingent on the
24  government's evidence.

25  THE COURT:  When you say barebones submission, what

1   does that mean to you?  And let me phrase it this way, because

2   I think that this is important.  We're sitting here less than

3   two weeks prior to trial.  I'm entirely open to the idea that

4   there are circumstances where it may be appropriate well in

5   advance of trial, potentially, for the government to file its

6   lists first, and in some ways for the defense to respond.

7   We're not sitting here a month before trial, but maybe we are.

8   So, I also want to be cognizant of my order, in light of that.

9   I think my order is different, potentially, if we're going to

10  trial in a week and a half versus if we're going to trial in

11  four months because of the burdens of proof, the defendant

12  being presumed innocent, and it may be unfair of me to order a

13  witness and exhibit list from the defense, whether we call it a

14  preliminary list or call it whatever, if the trial is going to

15  be in August.  I think it's entirely reasonable of me to enter

16  that order, if we're going to have trial in a week and a half.

17          So, you know, I think that raises several different

18  issues.  One of those is what you mean by *barebones*, but the

19  other of those is truly what this means in context of when the

20  trial is going to be.

21          *MS. SUELAU:*  Um ... I think barebones was a poor term.

22  I meant more of here are the, um ... most likely nonrebuttal

23  witnesses we anticipate calling.  So -- so providing, if we

24  have, in our minds, to present certain witnesses with some

25  certainty in the defense case, those are the people we would

1    put on our list.  Understanding that there's rebuttal witnesses

2    and things like that, that -- so I think the appropriate term

3    is, like, preliminary or, you know, subject to modification.

4           As to Your Honor's second question, yes, I think it's

5    difficult because we're in a bit of a ... holding pattern where

6    we've not made this decision, that is a massive decision, and

7    so what we would be asking -- I think the clear -- I think that

8    would be most helpful is if Your Honor maybe ordered the

9    government to submit their witness and exhibit lists on a date

10   certain, and then made ours contingent on, you know, unless a

11   motion to continue is filed or something like that or --

12   anticipated motion to continue.  Because a lot of our decisions

13   on witnesses on exhibits hinge on some of Your Honor's upcoming

14   decisions.

15          For example, we have subpoenaed a number of people who

16   are related to some of the 413 witnesses.  If those people

17   don't come in, obviously we wouldn't call potential rebuttal

18   witnesses for those individuals.

19          So there's a lot up in the air.  It would be most

20   helpful to us if we could have the government -- so we're

21   asking for a deadline for the government's witness and exhibit

22   lists.  If there could be some contingency on ours, on a

23   continuance; vacated in the event of a continuance, that would

24   be helpful to us.

25          *THE COURT:*  Okay.

1          *MS. SUELAU:*  And I don't -- I don't mean to hide the

2     ball in terms of a continuance.  I think, given your

3     Your Honor's indication of where you might be headed in terms

4     of the 413 witnesses that it's maybe more likely than not, at

5     this point.  But again, we don't want to make that final

6     decision without all of the available information and without

7     conferring with Mr. Wall about that.

8          And then the last thing that we would be asking is, I

9     guess in the world -- in the event of a continuance, I did

10    briefly speak with Mr. Clement and Mr. Player about this

11    Court's availability the last week in July and the first two

12    weeks in August.  My understanding is that the government and

13    Your Honor are available those dates, with preferences towards

14    the first two weeks in August.  I just want to make sure that's

15    correct, in the event that we move for a continuance, we can,

16    you know, sort of have a date set in our mind.

17         *THE COURT:*  Yes.  So, let me start there, and then I

18    will turn back, of course, to the government for a response on

19    a variety of these things, but I don't think a response is

20    needed in terms of the dates.

21         Just looking at -- when I say *last week of July*, I'm

22    talking about July 28th to August 1st.  That week currently has

23    set a civil trial in Denver that I have continued -- that case

24    was given to me when I started.  That case is a 2021 case.

25    Maybe it doesn't go, but I'm reluctant to force those parties

1   to move it again.  I have told them I'm not going to do that.

2          *MS. SUELAU:*  Understood.

3          *THE COURT:*  Moving forward from there, the next three

4   weeks, the week of the 4th, the week of the 11th and the week

5   of the 18th are all wide open.  I mean I have got other stuff

6   in there, but it can be moved around as appropriate.  So I

7   could definitely offer you time in those three weeks.  The week

8   of the 25th is our circuit conference, which I need to be at,

9   but I -- essentially, most of August is pretty wide open.  The

10  reality is the week of July 28th might end up being open too.

11  I have no idea what those parties are going to do, other than

12  they've set this case I think three different times, and we've

13  had to continue to bump it.  It is, unfortunately, ended up

14  being up against a criminal trial, at least twice, that has

15  bumped it already.  So, I don't want do to them again.

16         *MS. SUELAU:*  Okay.  Understood, Your Honor.  And so,

17  just to recap on a few things.  In large part, our decision on

18  a continuance is contingent on Your Honor's rulings, not just

19  on the 413 witnesses, but on the two, sort of, legal matters,

20  instructional matters that we discussed today.  Not -- because

21  they largely inform the government's, you know, theory of

22  prosecution and then our defense strategy.

23         As I expressed before, you know, part of our

24  reservation in seeking a continuance is that the government may

25  do what they've done in this instance, which is to retread some

1   ground or relitigate legal issues that have already been

2   variously briefed and/or decided by this Court, or have been

3   known to them, since this case began, and then they decide, *Oh,*

4   *okay, well nothing has changed but we want to bring up this new*

5   *legal issue that we didn't previously bring up.*

6        So, to the extent that Your Honor would entertain

7   precluding that kind of litigation at a minimum as untimely, I

8   think it would allow us to have a better analysis of the

9   potential prejudice to Mr. Wall of a possible continuance.

10       *THE COURT:* All right. Let me address that last point

11   first. At least in some part that issue was addressed

12   previously. Essentially, I take the request as, essentially,

13   an omnibus motion for me to issue an order telling people that

14   they can't go to new places, in some fashion. I'm denying

15   that, at least without prejudice. And I will just say, it

16   seems to me like whatever happened in the past, at this

17   juncture the parties are far more firmly and specifically

18   teeing up this case in light of legal theories and the facts

19   that support those theories. I'm not saying or saying that

20   that hasn't been done before. I don't think that there's any

21   need to go down that road. But what I will say is, it seems

22   like there's a set direction at this point in time, and the

23   parties are well aware of that, and absent some extraordinary

24   or unknown circumstance, I don't expect that that direction is

25   going to change, and would be reluctant to embrace such a

1   change, and the request for some specific order on that is

2   denied without prejudice, so that if the defense thinks that

3   it's gone there and shouldn't, they can raise that issue at a

4   later point in time.  But at least my judgment is to where the

5   case is now, is that there's significantly more definition and

6   discussion of these issues, and that it's headed in a very

7   distinct direction of being able to reach resolution of those,

8   and I have had full briefing and argument on the vast majority

9   of those issues that I think informs me and allows for

10  considered judgment.

11          In terms of, kind of, what to expect.  I expect that

12  you will receive, in relatively short order, which I think is

13  probably one to three days, an order on the 413 issues in

14  evidence.  I don't know that you will as quickly receive such

15  an order on the jury instruction issues, although we will

16  certainly labor to do that.  I hear an argument that that might

17  effect strategy to some extent, and maybe it does and maybe it

18  doesn't, but we will try to get that out as quickly as we

19  reasonably can.

20          Let's turn, Mr. Graves or Mr. Player, to you all for

21  the information that I think really needs response, which is

22  really the suggestions or requests with regard to witness,

23  exhibits and dates along those lines.

24          *MR. GRAVES:*  Your Honor, I don't think there would be

25  anything improper for having the Court order as layed out in

1  the Court's practice standards, and in any -- I think every

2  other judge's practice standards that I'm aware of, for the

3  parties to confer on their exhibit lists and their witness

4  lists and have those be filed at a specific date and time for

5  both parties.

6         I can tell the Court and the defense, there have been

7  really no material changes to the government's anticipated

8  witnesses.  There's no big surprise that's coming in terms of

9  what the government has.  Obviously, if we had to file our

10 lists today, we would list the 413 witnesses as may-call

11 witnesses, but we intend to call the alleged victims for those

12 instances and no collateral witnesses, such as law enforcement

13 or DNA.  I think the Court is aware of that.

14        If we're going to trial on May 19th, I would suggest

15 that the Court order the parties to do that by the end of the

16 day on Friday.  The other issue that was flagged to me by the

17 discussion on the Rule 413 evidence, I think the Court should

18 set a deadline for any Rule 412 notice, that is shortly after

19 this Court's order on Rule 413, because it may require the

20 government to coordinate travel with the victim to come in

21 person for ex parte hearing with the Court prior to trial.  So,

22 I think it's necessary to, as quickly as possible, after that

23 ruling, if not sooner, require that that notice be issued, so

24 we can comply with the requirements of that rule.

25        So, as soon as possible on everything.  We're pretty

1 | much ready to go on our witness list, as soon as the Court

2 | would like. In terms of the exhibits I think we've made some

3 | progress on that, back in February. We can continue to work

4 | with our partners across the aisle to hopefully make some

5 | meaningful progress on agreeing to any exhibits that can be

6 | agreed to. I think all of that can be accomplished by close of

7 | business Friday.

8 | THE COURT: All right. Give me just a moment to look

9 | at the calendar a bit. Alex, I don't know if you were able to

10 | see that last message I just sent you?

11 | We're sitting here on Tuesday. Realistically, I hope

12 | you have an order on the 413 within a couple days. I think

13 | that what makes sense, and I know that this causes time issues,

14 | but I'm concerned that -- well, I have concerns about the time

15 | that we have left, but ultimately that's a defense call to make

16 | in some respects, although not entirely, because the 412

17 | issues.

18 | So, I will phrase the order in this fashion. The

19 | government witness and exhibit list are to be filed by close of

20 | business on Friday, May the 9th. The defense filings are to be

21 | closed -- filed by close of business on Monday, May the 12th.

22 | And by filings, I mean this, I understand the defense would

23 | like to know where I'm going to jury instructions before making

24 | the call on trial, and I don't doubt the government would like

25 | to know as well, but I make no promises as to when you will see

1    those, other than I will endeavor to do them as quickly as

2    possible.  It seems to me that in large part, evaluation of

3    what is allowed in, in the 413 front, really informs the

4    parties the most, in terms of whether this matter is going to

5    proceed to trial, and that if the defense has those closer to

6    the end of this week, that one or more business days, as well

7    as the weekend, will be needed to evaluate and to have the

8    meaningful discussion with the defendant in this case, that

9    they no doubt need to have in making those final

10   determinations.

11         I also think it's fair to not require the defense to

12   simultaneously file their exhibit and witness lists, if they

13   are also going to be filing a motion to continue this trial.

14   So, those are going to be in the alternative.  By the close of

15   business on Monday the 12th, either a motion to continue is to

16   be filed or witness and exhibit lists are to be filed.  To some

17   extent, when the defense is seated in the rebuttal seat, which

18   they almost always are, exhibit and witness lists are somewhat

19   preliminary, because new things may come along the pike, but

20   our intent is to not have that be the case.  So, the defense is

21   to list, for both witnesses and exhibits, those that they

22   reasonably believe that they are going to be calling, based off

23   the information that they have at this time.  This isn't a

24   circumstance of trying to hide the ball, and I don't expect

25   that the defense will do that.  If new people come along, at a

1  later point in time, that also is something that will have to

2  be evaluated as it comes along at a later time, and that will

3  be subject to, potentially, dispute and exclusion, if there's

4  not a good reason for late listing of a witness and/or exhibit.

5      With regard to exhibits, I think the parties know

6  this, but I expect a fulsome discussion of those exhibits that

7  can be stipulated to without doing violence to your argument or

8  objections, so that we don't waste time, and to really limit

9  those objections with regard to exhibits to what needs to be

10  objected to.

11      Again, I'm not trying to force all reasonable legal

12  objections, but as the Circuit just upheld in Judge Martinez's

13  case, it is reasonable of a Court to put limitations on --

14  well, not to put limitations on, but to encourage, as I do, the

15  parties to engage in discussion about admission and stipulation

16  of exhibits, so that we don't waste time on matters that don't

17  need time to be wasted.

18      Also, if there's going to be a 412 motion, that needs

19  to be filed by the end of the day, on 5-12, and that gives some

20  time, I mean it's not much time, I don't know where we will get

21  a hearing in next week if we need to have a contested hearing,

22  but we will figure it out if that's the case.  Realistically,

23  it seems to me like if we're heading down that road, this is

24  going to be extremely difficult to do in the next week and a

25  half.  Ultimately, that's not my call to make, but we can all

1  look at the calendar and see how jammed up it's getting here in

2  short order.

3          Mr. Graves, Mr. Player, any orders you think need to

4  be issued that I missed?

5          *MR. PLAYER:*  No, Your Honor.

6          *THE COURT:*  All right.  Ms. Suelau?  Ms. Senia?

7          *MS. SUELAU:*  Not that I can see, Your Honor.

8          *THE COURT:*  Okay.  Well, thank you all.  I appreciate

9  the time and attention that everybody is putting into this.  It

10  truly deserves it, as much -- as difficult as it is.  So I

11  really appreciate that.

12          Tammy, thank you for sticking with us through a really

13  long hearing, and with that, I bid everybody a good rest of the

14  week and we will be in recess.  Take care everybody.

15      (Recess at 2:35 p.m.)

16                    REPORTER'S CERTIFICATE

17

18      I certify that the foregoing is a correct transcript from
   the record of proceedings in the above-entitled matter.

19

20      Dated at Denver, Colorado, this 7th day of July, 2025.

21                              s/Tamara Hoffschildt

22          _____

23          Tamara Hoffschildt, FCRR,RMR,CRR

24

25